UNITED STATES of America,
Appellee,

v.

Charles FREEMAN, Appellant.

No. 182, Docket 29688.

United States Court of Appeals
Second Circuit.

Argued Dec. 15, 1965.

Decided Feb. 28, 1966.

William E. Hellerstein, New York City (Anthony F. Marra, New York City, on the brief), for appellant.

Richard A. Givens, Asst. U. S. Atty., New York City (Robert M. Morgenthau, U. S. Atty. for Southern Dist. of New York, John E. Sprizzo, Asst. U. S. Atty., on the brief), for appellee.

Before WATERMAN, KAUFMAN and HAYS, Circuit Judges.*

KAUFMAN, Circuit Judge:

As legislation proliferates and judicial decisions multiply, our criminal law daily takes on increased complexity and sophistication. Subtle distinctions are constantly drawn; more perfect refinements continue to evolve. At the same time, however, there are a small number of more basic questions which cut across the whole of this evolutionary process, questions so fundamental to the very notion of criminal justice that they must continue to be asked—and, insofar as pos-

---

* Chief Judge Lumbard, Judges Friendly, Smith and Anderson have read the opinion of the panel and approve the standard of criminal responsibility adopted therein for use by the courts in this Circuit.

Judge Moore, to whom the opinion also was circulated, takes no position and expresses no views with respect to it. Neither he nor any other active Judge of this Court desires *en banc* consideration.

sible, answered—if the criminal law is truly to reflect the moral sense of the community. This appeal poses one of those questions.

After a trial before Judge Tenney without a jury, Charles Freeman was found guilty on two counts of selling narcotics in violation of 21 U.S.C. §§ 173, 174, and sentenced to concurrent terms of five years on each count. Although Freeman denied commission of the substantive offense, his principal allegation at trial was that, at the time of the alleged sale of narcotics, he did not possess sufficient capacity and will to be held responsible for the criminality of his acts.[1] In rejecting this contention, the District Court understandably relied upon the familiar M'Naghten[2] Rules which, in their traditional formulation, permit acquittal only when it is proved that, "at the time of the committing of the act, the party accused was laboring under such a defect of reason, from disease of the mind as not to know the nature and quality of the act he was doing, or, if he did know it, that he did not know he was doing what was wrong." 10 Clark and Fin. 200, 210 (1843). Since he could not find that Freeman's condition satisfied the rigid requirements of this test, Judge Tenney had no alternative but to hold the defendant guilty as charged.

For the reasons set forth below, we reverse and remand for a new trial. In so doing, we of course express no opinion as to the result which will or should be reached on the retrial. We do indicate, however, that the trial judge can in no way be faulted for following the M'Naghten test since, in so doing, he was unquestionably pursuing the course adopted by District Courts in this Circuit in the absence of appellate guidance on the subject.[3]

## THE EVIDENCE OF SALE

If the issue of criminal responsibility is put to one side for the moment, the facts of Freeman's case do not rise above the routine. The government's evidence established that on the evening of June 24, 1963, narcotics agents Coursey and Fluhr met one James Lockhart, an informant (or, in the more polite lexicon of the government, a "special employee"), in uptown Manhattan. After making the usual search of the informant in order to be sure he did not possess narcotics prior to contact with the suspect, Lockhart and Coursey walked to the corner of 110th Street and Broadway while Fluhr remained behind. Lockhart introduced Freeman to Coursey and, after some preliminary discussion, Freeman stated, "I hear you want to buy some heroin." When Coursey indicated that he did and

1. The omission from this opinion of the phrases "criminal insanity" and "criminally insane" is deliberate. Psychiatrists generally agree that the terms are meaningless for medical purposes, and, as will be seen *infra*, they are sufficiently ambiguous and misleading to warrant rejection by the law as well.

2. Justice Frankfurter advised The Times (London) that it had misspelled this inglorious individual's name who had "occasioned considerable conflict between law and medicine" and that referring to him in an article as "M'Naughten" instead of "M'Naghten" would make "inroads on his fame." When The Times replied that its spelling was based on "a letter signed by the man itself," the Justice displayed that pixy humor which delighted so many of his intimates by writing the Editor, "To what extent is a lunatic's spelling even of his own name to be deemed an authority?" Of Law and Life and Other

Things that Matter: Papers and Addresses of Felix Frankfurter, 1956–1963. 1–4 (Kurland ed. 1964).

We, like Justice Frankfurter, are content to rely on the spelling in the report of the case in 10 Clark & Fin. 200 and in The Royal Commission's 1953 Report on Capital Punishment.

3. As evolved by the District Courts of this Circuit, the M'Naghten test has been supplemented by the "irresistible impulse" rule, which provides for acquittal when it is proved that a defendant, at the moment of commission of his crime, was unable to obey the law and alter the course of his conduct even if he knew that his conduct was wrongful. At trial, Freeman's counsel conceded that the "irresistible impulse" rule had no application to the present case. As applied to Freeman, consequently, the governing principles were pure and undiluted M'Naghten.

inquired about the price, Freeman replied that it would be $230 a "piece."[4] At Freeman's suggestion, the three men then proceeded to the close-by Gold Rail bar, where Freeman gave Coursey a sealed brown paper bag in return for which Coursey mistakenly paid the defendant $130 instead of the stipulated $230. Coursey then left the bar and met Agent Fluhr and Agent Casale.[5] Together they performed a field test on the contents of the brown paper bag which revealed the presence of heroin. A chemical analysis subsequently confirmed this result.

Shortly thereafter, Coursey was notified by car radio that Lockhart had called him. Coursey returned to 110th Street and Broadway and entered a taxi in which Freeman and Lockhart had been riding. When Freeman asked if Coursey was trying to "beat" him out of $100, Coursey explained that the failure to make full payment in the bar had been a mistake and he turned over an additional $100.

On August 1, 1963, a second transaction took place; in many respects it was a sequel to the first. This time, Coursey and a different informant, Alfred Roach, entered Marvin's Bar on Broadway near 111th Street. Freeman, standing at the bar, said that he had been sick, but, nevertheless, had heard that Coursey had been buying large amounts of heroin and indicated that he would like to make another sale. A price of $235 per ounce was agreed upon and Freeman and Coursey adjourned to the men's room where Freeman handed Coursey another brown paper bag.[6] Coursey made payment, this time in the correct amount, and departed. A field test on the contents of the bag showed that it contained heroin and a chemical analysis confirmed the accuracy of this result.

While Freeman admitted taking part in the transactions of June 24 and August 1, he presented a different version of his participation. He testified that rather than being the culprit, he was merely a conduit being used by the informant to pass the brown paper packages to Agent Coursey. The money which the agent paid, Freeman said, was not his to keep, but was turned over to the informant who had furnished him in each instance with the brown paper bag. Judge Tenney chose to discredit Freeman's version of these transactions and we see no reason to disagree with his resolution of the credibility issue.

## THE DEFENSE OF LACK OF RESPONSIBILITY

As is not uncommon in cases in which the defense is raised, the bulk of the evidence directly relating to the issue of criminal responsibility took the form of expert psychiatric testimony of witnesses called by both the government and the defense. Freeman's expert witness at trial was Dr. Herman Denber, Associate Professor of Clinical Psychiatry at New York Medical College and Director of Psychiatric Research at Manhattan State Hospital. Dr. Denber, who had examined the defendant on the previous afternoon, testified that Freeman was not only a narcotics addict, but also a confirmed alcoholic. The Doctor noted that Freeman's body had become accustomed to the consumption of large amounts of heroin over a fourteen-year period, and that the defendant was in the habit of drinking one or two bottles of wine daily to increase the potency of the narcotics. In addition, he observed, Freeman regularly imbibed six to nine "shots" of whiskey each day.

Describing his examination in some detail, Dr. Denber testified that Freeman displayed no depth or variation in his

---

4. The phrase "$230 a piece" is slang for $230 an ounce.

5. Casale had been inside the Gold Rail bar and corroborated Coursey's testimony as to what occurred there.

6. Freeman apparently was uneasy in Marvin's Bar because he and the informant were the only Negroes present. Thus, Freeman hurrying to complete the transaction told Coursey, "Hurry up, man, because I got the stuff in my pocket and we look suspicious here because there is a whole lot of white people in here, we look suspicious in here."

emotional reactions, spoke in a flat monotone and paused for excessively long periods before responding to questions. Dr. Denber also noted that as a result of taking impure narcotics for so long a time, Freeman suffered from frequent episodes of toxic psychosis [7] leading to a clouding of the sensorium (inability to know what one is doing or where one is) as well as delusions, hallucinations, epileptic convulsions and, at times, amnesia.[8] The witness testified, moreover, that Freeman had suffered "knock-outs" on three occasions while engaging in prize fighting, and that these had led to a general vagueness about details. Finally, Dr. Denber observed that Freeman had experienced "innumerable brain traumata" which produced such organic and structural changes as destroyed brain tissue.

Restricted to stating a conclusory opinion within the confines of M'Naghten, Dr. Denber initially averred that Freeman was incapable of knowing right from wrong, even under a strict interpretation of that limited test. However, upon amplifying this conclusion, the defense expert acknowledged that Freeman had an awareness of what he was doing on the nights of June 24 and August 1 in the sense that he possessed cognition that he was selling heroin. The Doctor also added that Freeman was not in "such a state of toxicity that he did not remember the dates. He told me the story [of the nar-

cotics transactions] clearly, but it is my feeling about him, in particular, that as far as the social implications or the nature or meaning of what this meant to him at that moment he was not aware of it."

To respond to Dr. Denber's testimony, the government called on Dr. Robert S. Carson, a former staff physician at Payne-Whitney Clinic of The New York Hospital and Clinical Instructor in Psychiatry at Cornell University. Dr. Carson testified that Freeman was able to distinguish between right and wrong within the meaning of the M'Naghten test despite his heavy use of narcotics and alcohol. He noted that Freeman possessed the capacity to enter into purposeful activity such as the sale of narcotics, and he expressed the opinion that the defendant had been aware of the wrongfulness of his acts. In support of this view, Dr. Carson pointed to the fact that on the evening of August 1, 1963, Freeman had been sufficiently fearful of being apprehended that he had suggested that the transfer of naroctics take place in the privacy of the men's room of Marvin's Bar. In summary, Dr. Carson significantly acknowledged that Freeman had "some limitations" on his ability to distinguish right from wrong, but not to the degree required by the M'Naghten test.

Our examination of the record and medical reports also reveals that this

---

7. Dr. Denber defined a "psychosis" as "a disorder of the brain in which the individual's reality appreciation is altered and in which symptoms of thinking and feeling become abnormal." The term "toxic psychosis" refers to a "state of impaired mental functioning with clouding of the senses, non-awareness of time and place produced by some compound, usually medicinal, taken in excess over and above the usual requirements that are prescribed, and usually have been taken for a period of time by the individual."

8. Dr. Denber testified that because of Freeman's extensive and prolonged use of narcotics such as heroin, cocaine, morphine, and benzedrine, amphetamines and sleeping pills, he did not derive satisfaction from the standard "fix" and was

not, in any respect, just an ordinary drug addict. This massive infusion of drugs produced a condition which made Freeman at times, as he put it, so "messed up with the stuff" that he would fall "knocked cold in the street," with resultant head and other injuries. In addition, Freeman suffered from vomiting and chills and approximately twelve times a year for the last eight years, experienced auditory and visual hallucinations as well as paranoid delusions. For example, Freeman saw people in miniature and heard them call his name from under his bed. Indeed, Freeman told the Doctor, "At times I would think something was wrong with my head. I think the drugs I was using was eating up my brain."

thirty-five year old defendant possessed a minimal education and at the time of trial had been continuously addicted to narcotics for approximately 15 years, consuming as much as three bags of heroin a day. On several occasions, moreover, Freeman had sought medical help to relieve him of his addiction. In 1959, he voluntarily committed himself to the Federal Hospital in Lexington, Kentucky, but departed after a week. In addition, he received treatment for his addiction at Metropolitan Hospital in New York in the years 1961, 1962 and 1963, each time without success. The defendant also had an extensive criminal record relating to his use of drugs. Between 1951 and 1960, he was successfully prosecuted five times by the New York City authorities for possession of narcotics, his sentences ranging from sixty days to six months.[9] It is of considerable interest that on June 24, the date of the first transaction with Agent Coursey, Freeman had tested some "bad stuff" (impure narcotics) in addition to taking a strong sleeping pill, and testified that during the afternoon of the 24th, he was in a "nod" (a stupor). Indeed, on the day following the first transaction, he was so ill that he entered Metropolitan Hospital for treatment.

The record also discloses that prior to the trial Freeman's counsel moved for a psychiatric examination in order to determine the defendant's competency to stand trial. Freeman was ordered to Bellevue Hospital where he was examined between June 19 and June 23 and found sufficiently competent to be tried.[10]

Thereafter, Freeman's lawyer applied to the court for the appointment of a private psychiatrist to re-examine Freeman's competency to stand trial. Judge Bryan appointed Dr. Carson, who later testified for the government and whose revealing report agreed with the Bellevue finding that Freeman could be tried. The Doctor's conclusions, which were based on two examinations of Freeman at the Federal House of Detention, disclose these significant findings: "Mr. Freeman responded slowly to questions and commands * * * demonstrated a definite delayed reaction time as if it took him a few moments to comprehend the questions * * * on several occasions [he] complain[ed] that he had difficulty in expressing his thoughts * * * [Freeman has a] very poor employment record * * * He states that in addition to heroin he has taken large amounts of cocaine and wine * * * [and] while under influence of drugs he has had difficulty with memory. In addition, he has noted difficulty with co-ordination, and at times has felt very 'leary and scared and suspicious of everything.' 'I worry about myself mentally. People feel there is something wrong with me mentally. I don't talk too much. I can't read a book. I can't concentrate * * *.' He feels depressed and annoyed by the noise of other people. He understood the nature of the charges * * * and appeared unusually acceptant of his imprisonment. He demonstrated difficulty with mental calculations." The report of Dr. Carson concluded:

My examination of Charles Freeman reveals deviations from normal responses that are consistent with an opinion that there is a dulling of his thinking process. His vagueness in recalling certain specific events, his slowness in answering questions, and his difficulty performing rather simple mental calculations as well as his apparent indifference to his imprisonment are quite typical of a clinical condition frequently termed "Dulling Organicity." This condition is considered to be the result of a general-

---

9. On one occasion, Freeman received an indeterminate sentence but the record does not disclose how long he served.

10. The hospital summarized its findings to the court as follows:
   "We have a 35 year old man who shows no evidence of acute psychosis or mental

deficiency. He can best be described as a sociopathic personality with schizoid traits. It is respectfully recommended that after the disposition of the charges he receive correctional supervision."

ized, chronic, not overly severe damage to the higher thinking areas of the brain. I can detect no evidence [of] brain disease upon neurological examination. The diminished sensation on right leg is best explained as being the result of damage to the peripheral nerve and is not indicative of any central nervous system damage.

I do not consider Charles Freeman to be incompetent to understand the nature of the charges against him or to assist in his own defense. The quality and severity of his impairment is of insufficient extent to render him currently incompetent. In this latter regard my opinion is in agreement with the findings of Bellevue Psychiatric Hospital. I am also in agreement with Bellevue Hospital's opinion that Charles Freeman can be described as a * * * sociopathic personality with schizoid traits. My additional finding of a dulling of thinking processes raised the question of Mr. Freeman's ability to care for himself without rather close supervision. The finding of impaired thinking processes in the absence of neurological signs is usually the result of repeated noxious influences on the brain. The most common cause in Mr. Freeman's age group is prolonged and excessive use of drugs and/or alcohol.

The time for determining Freeman's "competency to stand trial" or to assist counsel is past and, accordingly, the propriety of that determination is not before

us on this appeal. We are now concerned with whether the Court at trial should have applied a test less rigid than that provided by M'Naghten,[11] so that the essential examination and psychiatric testimony could have been directed towards Freeman's capacity to exercise will or appreciate the wrongfulness of his conduct, rather than being confined to the relatively narrow inquiry required by M'Naghten.

## THE ISSUE RAISED AT TRIAL

We shall first dispose of the government's contention that the defense did not offer a proper objection to the Court's rulings on the test to be applied. We need not tarry long on this aspect of the case.

When questioning Dr. Denber, Freeman's counsel inquired if, under a "strict interpretation" of M'Naghten, Freeman would be considered criminally responsible. Before Dr. Denber could answer, the government objected on the ground that the question inadequately defined the standard the doctor was to apply in giving his response. Judge Tenney, without ruling directly on the government's objection, declared that "This Court is following the M'Naghten rule in this case."[12] Thus put on notice by the Court as to the governing standard, Freeman's counsel promptly agreed that he would not inquire of Dr. Denber whether Freeman was capable of conforming his actions to the law in terms of any definition of criminal responsibility other than that provided by M'Naghten.

---

11. At sentencing the Court recommended that the defendant be given a thorough physical and psychiatric examination for the purpose of determining which institution, the United States Public Health Service Hospital, Lexington, Kentucky, or the Medical Center for Federal Prisoners, Springfield, Missouri, would be more beneficial for him. This latitude which the trial judge had at the time of sentencing was unavailable, he believed, at the trial in assessing Freeman's criminal responsibility because of the restrictive M'Naghten Rules. The trial judge explained to Freeman at the sentencing, "the defense

witness [Dr. Denber] testified that [you] did know the nature and quality of [your] acts but [you] did not appreciate the extremely bad social consequences [your] acts could have, and I believe under the rules we have here that of itself is insufficient to indicate the defense of insanity."

12. At a later point, the trial judge referred to the test as M'Naghten plus "irresistible impulse" but ultimately returned to just M'Naghten when counsel informed him there was no "irresistible impulse" question in the case.

The government urges that the foregoing colloquy was not sufficiently specific, and accordingly asks us not to consider whether Freeman's competency was determined by the appropriate standard. Cf. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965). It argues that Freeman's counsel never objected to the court's decision to employ the M'Naghten Rules and, in addition, failed to offer alternative tests of criminal responsibility for the court's consideration. This failure, the government asserts, prevented Judge Tenney from passing meaningfully on the adequacy of M'Naghten with the result that we are deprived of the insight which prior judicial consideration could have provided.

█ We are persuaded that the colloquy with counsel referred to above sufficiently enlightened the court as to the point being raised. Fed.R.Crim.P. 51; see also Jackson v. United States, 250 F.2d 897 (5th Cir. 1958). The exchange between Judge Tenney and Freeman's counsel indicates quite clearly that the Judge understood counsel's desire to elicit evidence which would have been relevant if the Judge determined to employ tests of criminal responsibility broader and more liberal than M'Naghten. We think it equally clear, moreover, that counsel reasonably interpreted the Judge's statement that M'Naghten was the rule in this Circuit as a direction from the Bench to restrict questions addressed to the expert witnesses solely to psychiatric information which would be admissible under the "right-wrong" test. Even if counsel had made elaborate offers of proof of Freeman's incompetency under the alternative tests, it is probable that Judge Tenney would have adhered to his decision in view of the long-standing use of M'Naghten in the District Courts.[13] Since it is apparent that both Court and counsel were fully cognizant of the issues being raised—and since any further show-ing would have been an exercise in futility—it is entirely proper that we consider the governing principles on appeal.

## I.

It need scarcely be observed that the sufficiency of the M'Naghten Rules as a test of criminal responsibility would not be an open question to us if the Supreme Court had definitively spoken on the issue. Bound by Supreme Court precedent, we would of course be compelled to follow any decision of that body which adopted M'Naghten as the exclusive criterion in federal prosecutions, regardless of our dissatisfaction with such a test. As a distinguished attorney and former Secretary of State has recently and perceptively observed in another context, federal judges are hardly empowered to satisfy a mere "desire for change in the law in accordance with the decider's own conception of right. [They] may conscientiously be seeking to administer justice, but it is personal justice—the justice of Louis IX or Harun al-Rashid, not that described on the lintel of the Supreme Court Building, 'Equal Justice Under Law.' "[14]

Despite the government's arguments to the contrary, however, we do not believe that the Supreme Court has placed its stamp of approval on M'Naghten, and we find the cases cited for this proposition to be readily and clearly distinguishable. Thus, Davis v. United States (I), 160 U.S. 469, 16 S.Ct. 353, 40 L.Ed. 499 (1895), and Davis v. United States (II), 165 U.S. 373, 17 S.Ct. 360, 41 L.Ed. 750 (1897), do not represent a square holding as to the sufficiency of M'Naghten. The former was concerned with the issue of burden of proof—rather than the applicable standard—while the latter primarily involved a claim that the trial court's charge was so narrow as not even to give the defendant the full benefit of M'Naghten. Neither case, in short, raised the question whether M'Naghten should be

---

13. Even after Freeman's counsel mentioned the *Durham* test, see infra, Judge Tenney indicated that he would adhere to M'Naghten.

14. Acheson, Morning and Noon, 69 (1965).

replaced or supplemented by alternative tests.[15]

■ Subsequent cases are equally barren of direct challenges to M'Naghten. Hotema v. United States, 186 U.S. 413, 22 S.Ct. 895, 46 L.Ed. 1225 (1902), merely held a jury charge sufficiently broad to embrace the particular defense there asserted. Matheson v. United States, 227 U.S. 540, 33 S.Ct. 355, 57 L.Ed. 631 (1913), in which the charge strikingly foreshadowed the much later-developed *Durham* rule, turned on the fact that the instructions actually given were essentially those requested by the defendant. The remaining decisions cited by the government, finally, concern not a test to be applied in federal prosecutions, but rather the constitutional propriety under the Fourteenth Amendment's "due process" clause of state adoptions of M'Naghten or variations of M'Naghten. In Leland v. State of Oregon, 343 U.S. 790, 800, 72 S.Ct. 1002, 1008, 96 L.Ed. 1302 (1952), for example, Mr. Justice Clark wrote: "The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of science has not reached a point where its learning would *compel us to require the states to eliminate the right and wrong test from their criminal law*." (Emphasis supplied.) Our duty to supervise the administration of criminal justice in the courts of this Circuit can hardly be subject to the same restrictions as our power to impose constitutional requirements upon unwilling state tribunals.

Our conclusion that the Supreme Court has not definitively spoken on the issue is in accord with that of a substantial number of the Courts of Appeals which have considered the question. Although the Court of Appeals for the Ninth Circuit found that only the Supreme Court or Congress [16] could modify M'Naghten, Sauer v. United States, 241 F.2d 640 (9th Cir.), cert. denied, 354 U.S. 940, 77 S.Ct. 1405, 1 L.Ed.2d 1539 (1957), the District of Columbia, Third and Tenth Circuits adopted a contrary position. After an exhaustive analysis of the decisions in this area, Chief Judge Biggs, who has for many years advocated change and has authored exceptionally scholarly works on the subject, including his trail-blazing dissent in United States ex rel. Smith v. Baldi, 192 F.2d 540 (3d Cir. 1951), concluded that the Third Circuit need not feel "constrained to adhere to and uphold the M'Naghten Rules." United States v. Currens, 290 F.2d 751, 771 (1961). And Chief Judge Murrah, who has been an appellate judge for over a quarter of a century and has been in the forefront of judicial and administrative reforms, speaking for the Tenth Circuit, observed that since criminal responsibility was a rule of decision of the federal courts based upon common law concepts, it was always appropriate to "re-examine and re-appraise" it. Wion v. United States, 325 F.2d 420, 425 (1963), cert. denied 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 1309 (1964).[17] It also seems significant that in the face of a proliferation of cases in the area of criminal responsibility, the Supreme Court has consistently refrained from granting certiorari to consider this issue, despite inconsistent results among

15. The first Mr. Justice Harlan focused the question presented in *Davis I* as follows: "Upon whom then must rest the burden of proving that the accused, whose life it is sought to take under the forms of law, belongs to a class capable of committing crime." 160 U.S. at 485, 16 S.Ct. at 357.

While dicta are present in *Davis II* indicating approval of the trial judge's charge which was derived from M'Naghten, the record in that case leads us to believe that language is not sufficiently decisive to establish a rule of competency for the federal courts.

16. M'Naghten is strictly a judge-made rule. Its use in the federal system does not stem from any Act of Congress.

17. See also, Mueller, "M'Naghten Remains Irreplaceable: Recent Events in the Law of Incapacity," 50 Georgetown L.Jour. 105, 108 (1961): The courts of the United States "have inherent judicial power to rule on the law of insanity."

state courts and federal circuits.[18] At least one writer has suggested that the Supreme Court's inaction in this area is not mere coincidence, but is motivated by a desire to encourage the Circuits to discuss and develop alternative tests before making a definitive ruling.[19]

After considerable reflection on the issues presented, we therefore conclude that we cannot escape our duty to consider whether the M'Naghten Rules or the M'Naghten Rules augmented by the "irresistible impulse" test should continue to remain the test of criminal responsibility in this federal jurisdiction.

## II.

We are here seeking a proper test of criminal responsibility. That we are not instead deciding the initial question—whether lack of such responsibility, however defined, should be a defense in criminal prosecutions—itself seems significant and worthy of at least some brief comment.

The criminal law, it has been said, is an expression of the moral sense of the community. The fact that the law has, for centuries, regarded certain wrong-doers as improper subjects for punishment is a testament to the extent to which that moral sense has developed. Thus, society has recognized over the years that none of the three asserted purposes of the criminal law—rehabilitation, deterrence and retribution—is satisfied when the truly irresponsible, those who lack substantial capacity to control their actions, are punished.[20]

What rehabilitative function is served when one who is mentally incompetent and found guilty is ordered to serve a sentence in prison? Is not any curative or restorative function better achieved in such a case in an institution designed and equipped to treat just such individuals? And how is deterrence achieved by punishing the incompetent? Those who are substantially unable to restrain their conduct are, by definition, undeterrable and their "punishment" is no example for others; those who are unaware of or do not appreciate the nature and quality of their actions can hardly be expected rationally to weigh the consequences of their conduct. Finally, what segment of society can feel its desire for retribution satisfied when it wreaks vengeance upon the incompetent? Although an understandable emotion, a need for retribution can never be permitted in a civilized society to degenerate into a sadistic form of revenge.[21]

A recognition that traditional notions of crime and punishment were inapplicable to the truly "irresponsible" hence came early to Anglo-American criminal law. We turn now to a consideration of those early stirrings.

## III.

M'Naghten and its antecedents can, in many respects, be seen as examples of the law's conscientious efforts to place in a separate category, people who cannot be justly held "responsible" for their acts. As far back as 1582, William Lambard of Lincolns' Inn set forth what can be viewed as the forerunner of the

18. Among the most prominent cases are: United States v. Cain, 298 F.2d 934 (7th Cir.), cert. denied, 370 U.S. 902, 82 S. Ct. 1250, 8 L.Ed.2d 400 (1962); Sauer v. United States, 241 F.2d 640 (9th Cir.), cert. denied, 354 U.S. 940, 77 S.Ct. 1405 (1957); Wion v. United States, 325 F.2d 420 (10th Cir.), cert. denid, 377 U.S. 946, 84 S.Ct. 1354 (1964); Carter v. United States, 325 F.2d 697 (5th Cir.), cert. denied, 377 U.S. 946, 84 S.Ct. 1353, 12 L. Ed.2d 308 (1964); Dusky v. United States, 295 F.2d 743 (8th Cir.), cert. denied, 368 U.S. 998, 82 S.Ct. 625, 7 L.Ed. 2d 536 (1962).

19. Moore, Jr., "M'Naghten Is Dead—Or Is It?" 3 Houston L.Rev. 58, 60 (1965).

20. See Moberly, Responsibility, 1–24 (1956).

21. See Wechsler and Michael, "A Rationale of the Law of Homicide," 37 Col.L.Rev. 701, 752–761 (1937).

"Revenge," in the words of Francis Bacon, "is a kind of wild justice which the more man's nature runs to, the more ought law to weed it out."

M'Naghten test as we know it: "If a man or a natural fool, or a lunatic in the time of his lunacy, or a child who apparently has no knowledge of good or evil do kill a man, this is no felonious act * * * for they cannot be said to have any understanding will." [22] By 1724, the language had shifted from "good or evil" to the more familiar emphasis on the word "know." Thus, in Rex v. Arnold, 16 How. St.Tr. 695, 764 the "Wild Beast" test was enunciated. It provided for exculpation if the defendant "doth not *know* what he is doing, no more than * * * a wild beast." [23] (Emphasis added.)

By modern scientific standards the language of these early tests is primitive. In the 18th Century, psychiatry had hardly become a profession, let alone a science. Thus, these tests and their progeny were evolved at a time when psychiatry was literally in the Dark Ages. [24]

In the pre-M'Naghten period, the concepts of phrenology and monomania were being developed and had significant influence on the right and wrong test.

Phrenologists believed that the human brain was divided into thirty-five separate areas, each with its own peculiar mental function. The sixth area, for example, was designated "destructiveness." It was located, we are told, above the ear because this was the widest part of the skull of carnivorous animals. [25] Monomania, on the other hand, was a state of mind in which one insane idea predominated while the rest of the thinking processes remained normal. [26]

Of course, both phrenology and monomania are rejected today as meaningless medical concepts since the human personality is viewed as a fully integrated system. But, by an accident of history, the rule of M'Naghten's case froze these concepts into the common law just at a time when they were becoming obsolete. A discussion of M'Naghten's case will demonstrate how this came about. Daniel M'Naghten suffered from what now would be described as delusions of persecution. [27] Apparently, he considered his

22. As quoted in Moore, op. cit. supra, note 19 at 62.

23. It is highly significant that Dr. Carson's conception of the M'Naghten rule harked back to the right-wrong formulation's ancient forerunner, the "Wild Beast" test. Testifying for the government, Dr. Carson described his view of the high degree of emotional and cognitive impairment required for M'Naghten to become applicable: "My personal concept of somebody of that degree of mental illness would be that he would not be able to participate in this particular type of common relationship, that he would, for example, not be able to care for himself adequately, perhaps need some type of constant personal supervision and somebody to clothe him, feed him. He might be agitated to a high degree that he would be *a very wild, incoherent* type of person." (Emphasis added.)

24. For example, in this pre-M'Naghten period, belief in the concept of witchcraft was widespread and unfortunately, became entangled in the attempt to set forth rules of criminal responsibility. Indeed, witches and wizards could never be exculpated on the ground of criminal incompetency because, by definition, they could distinguish between right and

wrong. After all, these individuals who believed they possessed supernatural powers chose voluntarily to follow a course which was the very embodiment of evil. If it taxes credulity to acknowledge that "intelligent" people believed in witches and wizards, we merely need observe that no less an eminent legal scholar than Blackstone insisted that such creatures existed. Biggs, The Guilty Mind, 61 (1955).

25. Id. at 93.

26. Guttmacher and Weihofen, Psychiatry and the Law, 418 (1952).

27. Id. at 403. That Guttmacher and Weihofen are correct in their diagnosis of M'Naghten's illness is borne out by the following excerpt from one of M'Naghten's statements: "The tories in my native city have compelled me to do this. They follow and persecute me wherever I go, and have entirely destroyed my peace of mind * * *. I cannot sleep at night in consequence of the course they pursue towards me. * * * They have accused me of crimes of which I am not guilty, they do everything in their power to harass and persecute me; in fact they wish to murder me." Ellison and Haas, "A Recent Judicial Interpretation of the

major persecutor to be Robert Peel, then Prime Minister of England, for M'Naghten came to London with the intention of assassinating the chief of the Queen's government. His plan would have succeeded but for the fact that Peel chose to ride in Queen Victoria's carriage because of her absence from the city, while Drummond, his secretary, rode in the vehicle which normally would have been occupied by Peel. M'Naghten, believing that the Prime Minister was riding in his own carriage, shot and killed Drummond in error.[28]

After a lengthy trial in 1843, M'Naghten was found "not guilty by reason of insanity." M'Naghten's exculpation from criminal responsibility was most significant for several reasons. His defense counsel had relied in part upon Dr. Isaac Ray's historic work, Medical Jurisprudence of Insanity which had been published in 1838. This book, which was used and referred to extensively at the trial, contained many enlightened views on the subject of criminal responsibility in general and on the weaknesses of the right and wrong test in particular. Thus, for example, the jury was told that the human mind is not compartmentalized and that a defect in one aspect of the personality could spill over and affect other areas. As Chief Judge Biggs tells us in his Isaac Ray lectures compiled in The Guilty Mind, the court was so impressed with this and other medical evidence of M'Naghten's incompetency that

Lord Chief Justice Tindal practically directed a verdict for the accused.[29]

For these reasons, M'Naghten's case could have been the turning point for a new approach to more modern methods of determining criminal responsibility. But the Queen's ire was raised by the acquittal and she was prompted to intervene. Mid-19th Century England was in a state of social upheaval and there had been three attempts on the life of the Queen and one on the Prince Consort. Indeed, Queen Victoria was so concerned about M'Naghten's acquittal that she summoned the House of Lords to "take the opinion of the Judges on the law governing such cases." Consequently, the fifteen judges of the common law courts were called in a somewhat extraordinary session under a not too subtle atmosphere of pressure [30] to answer five prolix and obtuse questions on the status of criminal responsibility in England. Significantly, it was Lord Chief Justice Tindal who responded for fourteen of the fifteen judges, and thus articulated what has come to be known as the M'Naghten Rules or M'Naghten test. Rather than relying on Dr. Ray's monumental work which had apparently impressed him at M'Naghten's trial, Tindal, with the Queen's breath upon him, reaffirmed the old restricted right-wrong test despite its 16th Century roots and the fact that it, in effect, echoed such uninformed concepts as phrenology and monomania. In this manner, Dr. Ray's insights were to be lost to the common law for over one

M'Naghten Rule," 4 Brit.Jour. of Delinquency 129 (1953), as quoted in Roche, "Criminality and Mental Illness—Two Faces on the Same Coin," 22 Univ. of Chi.L.Rev. 320, 324 (1955).

28. Glueck, Mental Disorder and the Criminal Law, 162–63 (1925). See also Biggs, op. cit. supra, note 24 at 95–97.

29. Biggs, op. cit. supra, note 24 at 102.

30. A good example of the establishment's reaction to M'Naghten's acquittal is the address of the Lord Chancellor to the House of Lords: "A gentleman in the prime of life, of a most amiable character, incapable of giving offence or of injuring any individual, was murdered in the streets of this metropolis in open day. The assassin was secure; he was committed for trial; that trial has taken place, and he has escaped with impunity. Your Lordships will not be surprised that these circumstances have created a deep feeling in the public mind, and that many persons should, upon the first impression, be disposed to think that there is some great defect in the laws of the country with reference to this subject which calls for a revision of those laws in order that a repetition of such outrage may be prevented." As quoted in Glueck, op. cit. supra, note 28 at 164.

hundred years except in the small state of New Hampshire.[31]

The foregoing necessarily abbreviated historical account makes manifest some of the critical infirmities of the M'Naghten test, not the least of which are the manner in which it was formulated and the charged atmosphere in which it was spawned. Even contemporaries questioned the validity of a rule that was not the product of the case-by-case method traditional with common law judges. Thus, Mr. Justice Maule, the fifteenth member of the panel summoned by the House of Lords, concurred in the use of the right-wrong test but expressed deep reservations about answering questions put to the judges abstractly without the benefit of a concrete case and argument.[32] Sir James Stephen, the noted historian, was another who found fault with the system which produced M'Naghten. He observed that "every judgment delivered since the year 1843 has been founded upon an authority which deserves to be described as in many ways doubtful."[33] Dr. Henry Maudsley, Isaac Ray's English contemporary, remarked not long after the M'Naghten Rules were enunciated, that the judges were adhering to "an absurd dictum which has long been discredited by medical science."[34]

But the principal objection to M'Naghten is not that it was arrived at by this extraordinary process. Rather, the rule is faulted because it has several serious deficiencies which stem in the main from its narrow scope. Because M'Naghten focuses only on the cognitive aspect of the personality, i. e., the ability to know right from wrong, we are told by eminent medical scholars that it does not permit the jury to identify those who can distinguish between good and evil but who cannot control their behavior. The result is that instead of being treated at appropriate mental institutions[35] for a sufficiently long period to bring about a cure or sufficient improvement so that the accused may return with relative safety to himself and the community, he is ordinarily sentenced to a prison term as if criminally responsible and then released as a potential recidivist with society at his mercy. To the extent that these individuals continue to be released from prison because of the narrow scope of M'Naghten, that test poses a serious danger to society's welfare.[36]

Similarly, M'Naghten's single track emphasis on the cognitive aspect of the personality recognizes no degrees of incapacity. Either the defendant knows right from wrong or he does not and that is the only choice the jury is given. But such a test is grossly unrealistic; our mental institutions, as any qualified psychiatrist will attest, are filled with people who to some extent can differentiate between right and wrong, but lack the capacity to control their acts to a substantial degree. As the commentary to the American Law Institute's Model Penal Code observes, "The law must

---

31. Because of the influence of Dr. Ray, New Hampshire adopted a test which was a precursor of the modern *Durham* rule. See State v. Pike, 49 N.H. 399 (1870). See also, Reid, "Understanding the New Hampshire Doctrine of Criminal Insanity," 69 Yale L.Jour. 366 (1960); and Reid, "The Companion of the New Hampshire Doctrine of Criminal Insanity," 15 Vanderbilt L.Rev. 721 (1962).

32. See generally 67 Hansard's Parliamentary Debates (3d Series) 714–774.

33. II Stephen, History of the Criminal Law of England 153 (1883).

34. As quoted in Guttmacher, "The Psychiatrist as an Expert Witness," 22 U. of Chi.L.Rev. 325 (1955).

35. We recognize our inability to determine at this point whether society possesses sufficient hospital facilities and doctors to deal with criminals who are found to be incompetent. But our function as judges requires us to interpret the law in the best interest of society as a whole. We therefore suggest that if there are inadequate facilities and personnel in this area, Congress, the state legislatures and federal and state executive departments should promptly consider bridging the gap.

36. Biggs, op. cit. supra, note 24 at 145. See also Note, "Legislative Changes in New York Criminal Insanity Statutes," 40 St. John's L.Rev. 76 (1965).

recognize that when there is no black and white it must content itself with different shades of gray." [37]

A further fatal defect of the M'Naghten Rules stems from the unrealistically tight shackles which they place upon expert psychiatric testimony. When the law limits a testifying psychiatrist to stating his opinion whether the accused is capable of knowing right from wrong, the expert is thereby compelled to test guilt or innocence by a concept which bears little relationship to reality. He is required thus to consider one aspect of the mind as a "logic-tight compartment in which the delusion holds sway leaving the balance of the mind intact. * * * " [38]

Prominent psychiatrists have expressed their frustration when confronted with such requirements. Echoing such complaints, Edward de Grazia has asked, "How [does one] translate 'psychosis' or 'psychopathy' or 'dementia praecox' or even 'sociopathy' or 'mental disorder' or 'neurotic character disorder' or 'mental illness' into a psychiatric judgment of whether the accused knew 'right' from 'wrong.' " [39] In stronger and more vivid terms, Dr. Lawrence Kolb, Director of the New York Psychiatric Institute, Professor and Chairman of the Department of Psychiatry at Columbia University and Director of the Psychiatric Service at Presbyterian Hospital, expressed a simi-

lar viewpoint when he declared that "answers supplied by a psychiatrist in regard to questions of rightness or wrongness of an act or 'knowing' its nature constitute a professional perjury." [40]

Psychiatrists are not alone in their recognition of the unreality of M'Naghten. As long ago as 1930, Mr. Justice Cardozo observed that "everyone contends that the present definition of insanity has little relation to the truths of mental life." [41] And Mr. Justice Frankfurter, as a witness before the Royal Commission on Capital Punishment, declared with his usual fervor: "I do not see why the rules of law should be arrested at the state of psychological knowledge of the time when they were formulated. * * * I think the M'Naghten Rules are in large measure shams. That is a very strong word, but I think the M'Naghten Rules are very difficult for conscientious people and not difficult enough for people who say, 'We'll just juggle them.' " [42]

The tremendous growth of psychiatric knowledge since the Victorian origins of M'Naghten and even the near-universal disdain in which it is held by present-day psychiatrists are not by themselves sufficient reasons for abandoning the test. At bottom, the determination whether a man is or is not held responsible for his conduct is not a medical but a legal, social or moral judgment. Ideally, psy-

**37.** American Law Institute, Model Penal Code (Tentative Drafts, Nos. 1, 2, 3 and 4) 158 (1956). See also, Gaylin, "Psychiatry and the Law: Partners in Crime," Columbia University Forum 23 (1965).

M'Naghten's insistence on absolutes also was recently criticized by Truman Capote in his book, In Cold Blood, as "a formula quite color-blind to any gradations between black and white * * *." p. 294.

**38.** Glueck, op. cit. supra, note 28 at 169–170.

**39.** de Grazia, "The Distinction of Being Mad," 22 U. of Chi.L.Rev. 339, 341 (1955). Mr. de Grazia is a member of the District of Columbia Bar.

**40.** Remarks, Judicial Conference (2d Cir.), "Insanity as a Defense," 37 F.R.D. 365, 387 (1964).

**41.** What Medicine Can Do For Law, 32 (1930).

**42.** Report of the Royal Commission on Capital Punishment, 102 (1953). Indeed, the Royal Commission recommended abrogating M'Naghten and leaving the jury "to determine whether at the time of the act the accused was suffering from disease of the mind (or mental deficiency) to such a degree that he ought not to be held responsible." Id. at 116.

Mr. Justice Douglas and Mr. Justice Brennan have also indicated dissatisfaction with M'Naghten. See Douglas, "The Durham Rule: A Meeting Ground for Lawyers and Psychiatrists," 41 Iowa L. Rev. 485 (1956). Brennan, "Psychiatry Must Join in Defending Mentally Ill Criminals," 49 A.B.A.J. 239 (1960).

chiatrists—much like experts in other fields—should provide grist for the legal mill, should furnish the raw data upon which the legal judgment is based. It is the psychiatrist who informs as to the mental state of the accused—his characteristics, his potentialities, his capabilities. But once this information is disclosed, it is society as a whole, represented by judge or jury, which decides whether a man with the characteristics described should or should not be held accountable for his acts. In so deciding, it cannot be presumed that juries will check their common sense at the courtroom door. As Professor Wechsler has rightly commented, "It's not to be expected that juries will lightly accept the proposition that one who seemingly knew in a true sense did not know. One would expect jury skepticism and the system is the healthier for that jury skepticism."[43]

The true vice of M'Naghten is not, therefore, that psychiatrists will feel constricted in artificially structuring their testimony but rather that the ultimate deciders—the judge or the jury—will be deprived of information vital to their final judgment. For whatever the social climate of Victorian England, today's complex and sophisticated society will not be satisfied with simplistic decisions, based solely upon a man's ability to "know" right from wrong. It is in this respect that the vast strides made in public awareness and acceptance of psychiatry and psychiatric methods may even be more significant than the scientific developments which gave rise to them. Few areas of modern American culture— from the personnel offices of our giant corporations to the pages of our mass-circulation magazines—have been untouched by the psychiatric revolution. In this setting, a test which depends vitally on notions already discredited when M'Naghten was adopted can no longer be blandly accepted as representing the "moral sense of the community." To con-

tinue to apply such medically discarded concepts would be to follow a negative approach which is the result of a holdover of long outmoded attitudes rather than a policy decision grounded in reason or science.

## IV.

Efforts to supplement or replace the M'Naghten Rules with a more meaningful and workable test have persisted for generations, with varying degrees of success. Perhaps the first to receive judicial approval, however, was more an added fillip to M'Naghten than a true substitute: the doctrine which permits acquittal on grounds of lack of responsibility when a defendant is found to have been driven by an "irresistible impulse" to commit his offense.[44] In one form or another, the "irresistible impulse" test has become encrusted on the law of several jurisdictions, including the District Courts of this Circuit, and is now a familiar part of the vocabulary of millions since it was successfully invoked by the defendant of Robert Travers' celebrated novel and motion picture, "Anatomy of a Murder."

As it has commonly been employed, however, we find the "irresistible impulse" test to be inherently inadequate and unsatisfactory. Psychiatrists have long questioned whether "irresistible impulses" actually exist; the more basic legal objection to the term "irresistible impulse" is that it is too narrow and carries the misleading implication that a crime impulsively committed must have been perpetrated in a sudden and explosive fit. Thus, the "irresistible impulse" test is unduly restrictive because it excludes the far more numerous instances of crimes committed after excessive brooding and melancholy by one who is unable to resist sustained psychic compulsion or to make any real attempt to

---

43. Remarks, op. cit. supra, note 40 at 385.

44. See discussion in "Murder Without Apparent Motive: A Study in Personality Disorganization," by Satten, J., Menninger, K., Rosen, I., and Mayman, M., in 117 Am.Jour.Psych., 48–53 (1960).

control his conduct.[45] In seeking one isolated and indefinite cause for every act, moreover, the test is unhappily evocative of the notions which underlay M'Naghten—unfortunate assumptions that the problem can be viewed in black and white absolutes and in crystal-clear causative terms.

In so many instances the criminal act may be the reverse of impulsive; it may be coolly and carefully prepared yet nevertheless the result of a diseased mind.[46] The "irresistible impulse" test is therefore little more than a gloss on M'Naghten, rather than a fundamentally new approach to the problem of criminal responsibility. It is, as one professor explained, "a relatively unobnoxious attempt to improve upon M'Naghten." [47]

With the exception of New Hampshire, American courts waited until 1954 and Judge Bazelon's opinion for the District of Columbia Circuit in Durham v. United States,[48] for legal recognition that disease or defect of the mind may impair the whole mind and not a subdivided portion of it. The Durham court swept away the intellectual debris of a century and articulated a test which was as simple in its formulation as its sources were complex. A defendant is not criminally responsible, wrote Judge Bazelon, "if his unlawful act was the product of mental disease or mental defect." [49]

The advantages of Durham were apparent and its arrival was widely hailed. The new test entirely eliminated the "right-wrong" dichotomy, and hence interred the overriding emphasis on the cognitive element of the personality which had for so long plagued M'Naghten. The fetters upon expert testimony were removed and psychiatrists were permitted and indeed encouraged to provide all relevant medical information for the common sense application of judge or jury.

Finally, Durham ended to a large degree the "professional perjury" decried by psychiatrists—the "juggling" of legal standards made inevitable by M'Naghten and rightly deplored by Justice Frankfurter. Too often, the unrealistic dogma of M'Naghten had compelled expert witnesses to "stretch" its requirements to "hard cases"; sympathetic to the plight of a defendant who was not, in fairness, responsible for his conduct, psychiatrists had found it necessary to testify that the accused did not know his act was "wrong" even when the defendant's words belied this conclusion. In its frank and express recognition that criminality resulting from mental disease or defect should not bring forth penal sanctions, Durham brought an end to this all too-frequent practice of "winking" at legal requirements, a practice which had contributed little to the self-respect and integrity of either medicine or the law.

In the aftermath of Durham, however, many students of the law recognized that the new rule, despite its many advantages, also possessed serious deficiencies. It has been suggested, for example, that Durham's insistence that an offense be the "product" of a mental disease or defect raised near-impossible problems of causation,[50] closely resembling those encountered by the M'Naghten and irresistible impulse tests.

The most significant criticism of Durham, however, is that it fails to give the fact-finder any standard by which to measure the competency of the accused. As a result, psychiatrists when testifying that a defendant suffered from a "mental disease or defect" in effect usurped the jury's function. This problem was strikingly illustrated in 1957,

---

45. Wechsler, "The Criteria of Criminal Responsibility," 22 U. of Chi.L.Rev. 367, 393 (1955).

46. See Report, Royal Commission on Capital Punishment, op. cit. supra note 42 at 110.

47. Mueller, op. cit. supra note 17 at 107.

48. 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954).

49. Id. at 874.

50. Weihofen, "The Flowering of New Hampshire," 22 U. of Chi.L.Rev. 356, 360 (1955).

when a staff conference at Washington's St. Elizabeth's Hospital reversed its previous determination and reclassified "psychopathic personality" as a "mental disease." Because this single hospital provides most of the psychiatric witnesses in the District of Columbia courts, juries were abruptly informed that certain defendants who had previously been considered responsible were now to be acquitted. Blocker v. United States, 110 U.S.App.D.C. 41, 288 F.2d 853, 860 (1961) (Burger, J., concurring). It seems clear that a test which permits all to stand or fall upon the labels or classifications employed by testifying psychiatrists hardly affords the court the opportunity to perform its function of rendering an independent legal and social judgment.[51]

## V.

In 1953, a year before *Durham*, the American Law Institute commenced an exhaustive study of criminal conduct including the problem of criminal responsibility. In the ensuing months and years, under the scholarly direction of Professors Herbert Wechsler of Columbia University, its Chief Reporter, and Louis B. Schwartz of the University of Pennsylvania, Co-Reporter, the leading legal and medical minds of the country applied themselves to the task. Gradually and painstakingly a new definition of criminal responsibility began taking shape as Section 4.01 of the Model Penal Code was evolved. Before its penultimate articulation, drafts and redrafts of the section were submitted to and revised by an advisory committee comprised of distinguished judges, lawyers, psychiatrists, and penologists. After committee approval was obtained, successive drafts were debated and considered by the Council, and later by the full membership, of the Institute. Nine long years of research, exploration and consideration culminated in the definitive version of Section 4.01, which was finally adopted by the Institute in 1962.

Section 4.01 provides that "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law."[52] For reasons which will be more fully set forth, we believe this test to be the soundest yet formulated and we accordingly adopt it as the standard of criminal responsibility in the Courts of this Circuit.

The gravamen of the objections to the M'Naghten Rules is that they are not in harmony with modern medical science which, as we have said, is opposed to any concept which divides the mind into separate compartments—the intellect, the emotions and the will. The Model Penal Code formulation views the mind as a unified entity and recognizes that mental disease or defect may impair its functioning in numerous ways. The rule, moreover, reflects awareness that from the perspective of psychiatry absolutes are ephemeral and gradations are inevitable. By em-

---

51. To correct many of the deficiencies of *Durham*, the Washington, D. C. Court of Appeals amplified its definition of mental disorder for the purpose of making "it very clear that neither the court nor the jury is bound by ad hoc definitions or conclusions as to what experts state is a disease or defect." To reinforce its decision, the Court redefined mental disease and defect to include "any abnormal condition of the mind which *substantially* affects mental or emotional processes and *substantially* impairs behavior controls." McDonald v. United States, 114 U.S.App.D.C. 120, 312 F.2d 847, 851 (1962) (Emphasis added). It thus adopted a formulation which close-

ly approximates the recommendation of the American Law Institute in its Model Penal Code. See infra.

52. American Law Institute, Model Penal Code (final draft) (1962).
We have adopted the word "wrongfulness" in Section 4.01 as the American Law Institute's suggested alternative to "criminality" because we wish to include the case where the perpetrator appreciates that his conduct is criminal, but, because of a delusion, believes it to be morally justified. See People v. Schmidt, 216 N.Y. 324, 110 N.E. 945, L.R.A. 1916D 519 (1916) (Cardozo, J.).

ploying the telling word "substantial" to modify "incapacity," the rule emphasizes that "any" incapacity is not sufficient to justify avoidance of criminal responsibility but that "total" incapacity is also unnecessary. The choice of the word "appreciate," rather than "know" in the first branch of the test also is significant; mere intellectual awareness that conduct is wrongful, when divorced from appreciation or understanding of the moral or legal import of behavior, can have little significance.

■ While permitting the utilization of meaningful psychiatric testimony,[53] the American Law Institute formulation, we believe, is free of many of the defects which accompanied *Durham*. Although it eschews rigid classification, the Section is couched in sufficiently precise terms to provide the jury with a workable standard when the judge charges in terms comprehensible to laymen.[54] Expert testimony, in short, will be admissible whenever relevant but always *as* expert testimony—and not as moral or legal pronouncement. Relieved of their burden of divining precise causal relationships, the judge or jury can concentrate upon the ultimate decisions which are properly theirs, fully informed as to the facts.

Under the American Law Institute formulation, an inquiry based on meaningful psychological concepts can be pursued.[55] The most modern psychiatric insights will be available, but, even more importantly, the legal focus will be sharper and clearer. The twin branches of the test, significantly phrased in the alternative, will remove from the pale of criminal sanctions precisely those who are in no meaningful sense responsible for their actions.

We do not delude ourselves in the belief that the American Law Institute test is perfect. Perfection is unattainable when we are dealing with a fluid and evolving science. Furthermore, we are aware that the Courts of Appeal for the District of Columbia, Third and Tenth Circuits have not adopted the American Law Institute test *haec verba*, but have employed their own language approaching the objectives of the Model Penal Code formulation.[56] As an illustration,

---

53. We note that while the Model Penal Code permits, and, indeed, encourages the production of full psychiatric data and information at trial, such testimony can have weight only if the underlying examination of the defendant was thorough. In most instances, one hour of psychiatric examination of the defendant in the House of Detention in preparation for trial is not an adequate substitute for a complete psychiatric and neurological work-up of the defendant in a hospital under the care and guidance of a staff of experts.

Moreover, as we have indicated, for many years pyschiatrists have urged, almost with one voice, the replacement of the M'Naghten rule. Their persuasive advocacy of change is now meeting with gradual success, as modern psychiatric theories of normal and deviant personality development and functioning have gained increasing acceptance. It is desirable, therefore, that the altered standard for criminal responsibility which has been adopted today should not become the *causa sine qua non* of unseemly contests between psychiatric experts. We may anticipate a weakening of public confidence in the value of psychiatric concepts and a reaction against them if this should result.

54. In framing charges, the following caveat is interesting: "I believe that mental disease is a complex and intricate matter and we cannot make it simple and understandable to everyone just by inventing simple words or phrases to describe it." 112 Cong.Rec. 2855 (1966) (Remarks of Senator Thomas J Dodd).

55. The opportunity that psychiatrists will now have to present their findings and conclusions in their own scientific language should remove a barrier which made such experts reluctant to give testimony in cases turning on M'Naghten. We trust that they will also now make themselves available to be called on for testimony under the provisions of the Criminal Justice Act or where the court may desire the opinion of an independent expert.

56. New York State, on July 1, 1965, rejected M'Naghten and adopted a test based largely upon the American Law In-

in the scholarly opinion of Chief Judge Biggs in United States v. Currens, supra, the Third Circuit adopted the second branch of the Model Penal Code test—substantial capacity to conform one's conduct to the requirements of the law—but deleted the first, referring to "appreciation" of wrongfulness. While we can understand that Court's reluctance to stress the cognitive element of the personality in light of M'Naghten's emphasis on that aspect, we cannot accept its formulation; the gravamen of psychiatric objections to the M'Naghten Rules, as we have seen, was not that they looked to the cognitive feature of the personality, undeniably a significant aspect of the total man, but that they looked to this element *exclusively*. In Wion v. United States, supra, Chief Judge Murrah in his thoughtful opinion adopted Section 4.01, but added a proposed jury instruction relating to the defendant's capability of "knowing" what he was doing; for reasons we need not labor, we prefer the Model Penal Code's use of "appreciate" rather than "know."

We believe, in sum, that the American Law Institute test—which makes no pretension at being the ultimate in faultless definition—is an infinite improvement over the M'Naghten Rules, even when, as had been the practice in the courts of this Circuit, those Rules are supplemented by the "irresistible impulse" doctrine. All legal definitions involve elements of abstraction and approximation which are difficult to apply in marginal cases.[57] The impossibility of guaranteeing that a new rule will always be infallible cannot justify continued adherence to an outmoded standard, sorely at variance with enlightened medical and legal scholarship. No one would suggest that a physician-expert called to state an opinion with respect to a litigant's orthopedic or neurological condition should be restricted in his reply to a single isolated cause to the exclusion of other relevant and important findings and conclusions—much less to concepts developed at the outset of Victoria's reign. In a criminal trial, when life and liberty hang in the balance, such arbitrary limitations on expert and jury are all the less defensible.

The genius of the common law has been its responsiveness to changing times, its ability to reflect developing moral and social values. Drawing upon the past, the law must serve—and traditionally has

stitute formulation. Section 1120 of the New York Penal Law, McKinney's Consol. Laws c. 40, provides:

A person is not criminally responsible for conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity to know or appreciate either:

(a) The nature and consequence of such conduct; or

(b) That such conduct was wrong.

In addition, Vermont has provided by statute that "The M'Naghten test of insanity in criminal cases is hereby abolished." Vermont Stat.Anno. § 13:4802. And in 1957, Vermont enacted as its rule for determining criminal responsibility, a formulation strikingly similar to Section 4.01 of the Model Penal Code:

A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks adequate capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. Vermont Stat. Anno. § 13:4801.

Connecticut. also, does not adhere to a strict M'Naghten formulation. Its test for criminal competency states:

To be the subject of punishment, an individual must have mind and capacity, reason and understanding enough to enable him to judge of the nature, character and consequence of the act charged against him, that the act is wrong and criminal, and that the commission of it will justly and properly expose him to penalty. State v. Davies, 146 Conn. 137, 148 A.2d 251, cert. denied, 360 U.S. 921, 79 S.Ct. 1441, 3 L.Ed.2d 1537 (1959).

It would be incongruous, indeed, if the federal courts which have traditionally concerned themselves with formulating guidelines for fairer trials were to remain frozen to the old M'Naghten Rules while the state courts in this Circuit pursued the more modern and enlightened course.

57. See Report, Royal Commission on Capital Punishment, op. cit. supra note 42 at 114.

served—the needs of the present. In the past century, psychiatry has evolved from tentative, hesitant gropings in the dark of human ignorance to a recognized and important branch of modern medicine. The outrage of a frightened Queen has for too long caused us to forego the expert guidance that modern psychiatry is able to provide.

## VI.

Since Freeman's responsibility was determined under the rigid standards of the M'Naghten Rules, we are compelled to reverse his conviction and remand the case for a new trial in which the criteria employed will be those provided by Section 4.01 of the Model Penal Code.

And lest our opinion be misunderstood or distorted, some additional discussion is in order. First, we wish to make it absolutely clear that mere recidivism or narcotics addiction will not *of themselves* justify acquittal under the American Law Institute standards which we adopt today. Indeed, the second clause of Section 4.01 explicitly states that "the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or otherwise anti-social conduct." We approve and adopt this important caveat.

There may be instances where recidivists will not be criminally responsible, but this will be for determination in each individual case depending upon other evidence of mental disease augmenting mere recidivism with the ultimate determination dependent upon the proper application of the standards we have adopted. But, we stress, repeated criminality cannot be the *sole* ground for a finding of mental disorder; a contrary holding would reduce to absurdity a test designed to encourage full analysis of all psychiatric data and would exculpate those who knowingly and deliberately seek a life of crime.

Nor may narcotics addiction without more be the sole evidence of abnormality under the American Law Institute test. We have observed that the defense of lack of responsibility is essentially an acknowledgment on the part of society that because of mental disease or defect certain classes of wrongdoers are not properly the subjects of criminal punishment. In light of the severe penalties imposed by Congress for the possession and sale of narcotics, it would be unwise at this stage of medical knowledge, for a court to conclude that those addicted to narcotics should be, for that reason alone, immune from criminal sanctions.

Secondly, in order to avoid any misapprehension as to the thrust of our opinion some mention should be made of the treatment to be afforded individuals found to lack criminal responsibility under the test we adopt. There is no question but that the security of the community must be the paramount interest. Society withholds criminal sanctions in cases of incompetence out of a sense of compassion and understanding. It would be obviously intolerable if those suffering from a mental disease or defect of such a nature as to relieve them from criminal responsibility were to be set free to continue to pose a threat to life and property.

A verdict of "not guilty by reason of incompetency" has, in the past, been equivalent in the federal judicial system to a simple "not guilty" verdict because of the existing void in provisions for commitment and treatment. As a result of the comparatively recent adoption by various federal courts of more enlightened tests of responsibility, we trust that Congress will explore its power to authorize commitment of those acquitted on these grounds.[58] Such was the result of *Durham* in the District of Columbia; shortly after that decision, Congress provided for mandatory post-trial commitment in all cases in the District resulting in acquittals on grounds of lack of responsibility.[59] Pending Congressional ac-

58. But see, Pollard v. United States, 285 F.2d 81 (6th Cir. 1960).

59. Krash, "The Durham Rule and Judicial Administration of the Insanity Defense

tion, however, we are confident that the several states will continue to step into the breach as they have in the past. Accordingly, we suggest that those adjudged criminally irresponsible promptly be turned over to state officials for commitment pursuant to state procedures.

Effective procedures for institutionalization and treatment of the criminally irresponsible are vital as an implementation to today's decision.[60] Throughout

our opinion, we have not viewed the choice as one between imprisonment and immediate release. Rather, we believe the true choice to be between different forms of institutionalization—between the prison and the mental hospital. Underlying today's decision is our belief that treatment of the truly incompetent in mental institutions would better serve the interests of society as well as the defendant's.[61]

in the District of Columbia," 70 Yale L.Jour. 905, 940–948 (1960). D.C.Code Anno. § 24–301(d).

60. As Professor Wechsler observed, commitment after a verdict of "not guilty by reason of criminal incompetency" is not only desirable but necessary in the sound administration of justice: " * * * I also believe that it is part of any proper system that when a defendant in a criminal case asks for exemption from conviction and condemnation on the ground of irresponsibility, that it is appropriate that there should be as a requirement of law a civil commitment if that defense is sustained. And that, as a matter of fact, is now the law of New York as a result of a statute [N.Y.Code Crim.Proc. § 454] passed two or three years ago. Now, how long should the detention last? Well, it certainly ought to last long enough to allow a full diagnostic study and a determination as to whether it is safe to release the offender from his own point of view and from the point of view of others. The New York statute justified detention on grounds of public danger so long as that danger endures." Remarks, op. cit. supra note 39 at 398.

We believe that such institutionalization will deter "normal" defendants from choosing to defend on the ground of irresponsibility. The prospect of commitment to a mental institution for an indeterminate period is much less desirable than a fixed term in prison. See Fried, "Impromptu Remarks," 76 Harvard L. Rev. 1319 (1963). See also Report, Royal Commission on Capital Punishment, op. cit. supra, note 42 at 104–5.

61. Indeed, the Judiciary Committee of the United States Senate has been concerned with M'Naghten, *Durham* and their progeny. Senator Thomas J. Dodd of Connecticut, a member of that Committee and Chairman of a sub-committee which made an exhaustive study of the operation of *Durham* as refined by *McDonald*, supra, revealed his perceptiveness in a statement on the subject of criminal re-

sponsibility. 112 Cong.Rec. 2853–2856 (1966). Senator Dodd recognizing that "the mental patient and his status under criminal law constitute a problem that has defied solution throughout history," nevertheless firmly rejected M'Naghten and cautioned against retreating to its precepts and adopting "less satisfactory procedures because of peripheral rather than substantial difficulties involved in maintaining [Durham]."

Speaking of the need for proper treatment of those found not guilty by reason of incompetency, Senator Dodd observed:

I do not want the courts to revert to injustice because it is too difficult or too expensive or too inconvenient to make justice work * * *. What I am saying is that we should be more concerned with determining whether or not an offender is mentally incompetent than with inventing techniques, definitions and procedural devices to keep insanity pleas to the minimum. * * *

The thin line between criminal responsibility and irresponsibility because of mental disease is not always clearly visible. Thus, we are confronted with questions of policy regarding how we want to react to marginal cases. It seems that the general public and certain segments of the legal profession and law enforcement would like to treat them as criminals rather than as patients. And yet, if we send even marginal cases to the mental hospital and rehabilitate them so that they no longer break the law, we have scored a success. On the other hand, if we send such marginal cases to prison, they may come back to haunt society after their release, more mentally disturbed, more irresponsible, and more crime prone than ever before, because whatever the prison does to men it does not cure mental illness.

This is the type of reasoning which has led me to support in principle a rather general and inclusive rule of criminal responsibility instead of a narrow and restrictive one * * *. The important thing is to render the dangerous person

## VII.

Our opinion thus far has been confined to the issue of criminal responsibility. Freeman's appeal was not limited to this one question; citing Escobedo v. State of Illinois,[62] he also claimed error in the introduction of his inculpatory statements at trial. Since we are returning this case to the District Court for retrial we shall comment on Freeman's assertion that such alleged statements made at the time of apprehension were improperly admitted into evidence. Freeman was arrested by agents Wilkocki and Leader at his mother's apartment in Harlem. He was informed of the charge against him, told to dress and taken to a waiting government car. Wilkocki testified that he informed Freeman of his right to remain silent but failed to advise him that he was entitled to the assistance of counsel. Freeman, on the other hand, testified that he was, indeed, told, "Well you can get a lawyer. You don't have to say anything." The defendant went on to assert, however, that although he asked for permission to call an attorney while still in his mother's home, and, again, in the car and at Narcotics Bureau Headquarters he was never given the opportunity to do so. Wilkocki denied such requests were ever made. Although he did acknowledge that Freeman requested permission to call his wife and that there was "something to do with bail but I am not sure." In any event, Freeman denied making any inculpatory statements at all to Wilkocki.

After a voir dire examination dealing with Freeman's "right to counsel," Judge Tenney, over objection,[63] permitted Wilkocki to testify that in the car as well as at Narcotics Bureau Headquarters, Freeman admitted selling heroin to Coursey on June 24 and August 1.

In his decision, Judge Tenney did not specifically resolve the contradictions in the testimony of Freeman and Agent Wilkocki with respect to whether Freeman did on the three occasions request permission to call an attorney and, in turn, whether such requests were refused. Because of the retrial, we believe it might be helpful if we gave a general indication of our views on the issue raised without, however, attempting to dispose of the question on the merits. As we observed in United States v. Cone, 354 F.2d 119 (2d Cir. 1965), United States v. Robinson, 354 F.2d 109 (2d Cir. 1965), and United States v. Drummond, 354 F.2d 132 (2d Cir. 1965), cases involving inculpatory statements made in the absence of counsel must be considered ad hoc in each instance and resolved on the particular factual pattern presented. While we approved the admission into evidence of such inculpatory statements in the three cited cases, the instant case is not rigidly controlled by those decisions for the facts differ materially. Unlike Drummond, Freeman made disclosures upon apprehension in response to *interrogation* and after an alleged denial of an opportunity to call counsel. This is in sharp contrast, for example, to Drummond's threshold disclosures which were volunteered and spontaneous. It need hardly be added, moreover, that Freeman's questioned mental condition may be a further distin-

---

harmless. And it is best to do this by correction rather than simply by incarceration * * *.

We must make sure that we do not attack the law when the deficiency, may be elsewhere, for example, in the release procedures from our institutions. * * * By definition, a mentally ill person must be committed to an institution for an indeterminate period of time. We owe the public the protection of keeping him there until cured * * *. I believe this procedure is by far sounder than the "ostrich approach" of sending mentally diseased men and women to prison, hop-

ing that they will be miraculously cured and rehabilitated in a place we know to be traditionally incapable of producing such resurrections.

62. 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed. 2d 977 (1964).

63. The government's contention that an inadequate objection was made is without merit. Cf. United States v. Indiviglio, 352 F.2d 276 (2d Cir. 1965), where, unlike the instant case, no voir dire was had and consequently no record made to lay a foundation for an appeal on this issue.

guishing feature. As we indicated in *Drummond* the surrounding circumstances and atmosphere as well as the condition of the accused will be important elements for the Trial Judge to consider in determining the penumbral point when the right to counsel attached.[64]

The Court is indebted to William E. Hellerstein, Esq. who represented Freeman as assigned counsel, for a thorough and effective presentation.

Reversed and remanded.

WATERMAN, Circuit Judge (concurring in the result):

Though it is a bit difficult to cast aside the belief that one who plans to perform certain acts and does them according to plan should be held responsible for his conduct, I realize that that belief is out of style these days, and that modernists hold that one's will may be so meaninglessly exerted as not to have any causal relationship to conduct.

Therefore, I am happy to concur with my colleagues in promulgating for the time being the standard of responsibility for one's conduct that is set forth in the American Law Institute's May 4, 1962 Official Draft of its Proposed Model Penal Code, to wit:

Section 4.01 Mental Disease or Defect Excluding Responsiblity

(1) A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law.

(2) The terms "mental disease or defect" do not include an abnormality manifested only by repeated criminal or otherwise antisocial conduct.

Modern beliefs, which have apparently been validated by responsible empirical studies, regarding the determinants of a person's conduct, require of the judiciary that we modernize our judge-made rules that relate to the relationship between intent-activation and conduct. In so doing we but simply continue the process of judicial adaptation to new discoveries, new conditions, even new terminologies, which adaptation has been the peculiarly significant genius of our judge-made common law.

I say "for the time being," for though we now have been persuaded that we should be dissatsfied with the M'Naghten Rules because of the discoveries which, whether for good or ill, have in the six score years since M'Naghten changed our concepts of "mental disease," it is nevertheless also true that the scope of serious expert inquiry into the control of conduct has not halted, and tomorrow we may find that Section 4.01 needs further judicial emendation in the light of tomorrow's further discoveries. In the present case, then, I join my brothers in remanding the case to the district court for a new trial, the trial to be so conducted as to permit the introduction of testimony germane to a factual resolution of behavioral responsibility contemplated by the above-quoted Section 4.01, and, in which, when

---

64. As we stated in *Drummond*, supra:

Had Drummond asked for counsel at the beginning of the interview when he was informed of that right, or had he plainly indicated a desire not to talk before counsel arrived, and then had the agents refused him access to counsel and questioned him relentlessly, the case might be different. Certainly we are not deciding that the police may lightly disregard an accused's request to consult counsel during pre-arraignment questioning, even where the questioning is legitimately motivated. In fact, the denial of a request to call counsel during a pre-arraignment interview may, in other circumstances, render any incriminating statements inadmissible. * * *

The coercive or noncoercive context in which the admissions were made; i.e., the spontaneity or responsive nature of the statements, the physical conditions of interrogation, the period lapsing after arrest before the statements were made, the intelligence level of the defendant, his legal sophistication, his subjective state of mind and health are all relevant to the ultimate determination. 354 F.2d at 147, 146 (2d Cir. 1965).

 

the evidence shall have been closed, the finder of fact shall determine the defendant's responsibility for his alleged criminal conduct by recourse to that Section's standards.