**Ray Wayne PIERCE, Plaintiff,**

v.

**John W. TURNER, Warden, Utah State Prison, Defendant.**

**No. C 84–67.**

United States District Court
D. Utah,
Central Division.
Oct. 23, 1967.

Delbert M. Draper, Jr.,* Salt Lake City, Utah, for plaintiff.

Phil L. Hansen, Atty. Gen. for State of Utah, Gerald G. Gundry, Asst. Atty. Gen., for defendant.

## MEMORANDUM DECISION

### CHRISTENSEN, District Judge.

In the contemporary setting of psychiatry, psychosis, psychology, sociology, sensualism, psychedelics and sniffing of glue, again there is under attack in this case the continued constitutional viability of the venerable *M'Naghten*.[1] And another old common law concept—that voluntary intoxication is no excuse for the commission of crime but may be considered only in relation to such questions as intent or motive—is within the target area.

On October 13, 1964, the petitioner Ray Wayne Pierce, after conviction upon verdict of a jury, was sentenced in the Third Judicial District Court of the State of Utah to be confined in the Utah State Prison for the indeterminate term provided by law for the crime of murder in the second degree. This conviction was appealed to the Utah Supreme Court and the judgment was affirmed.[2] The state court determined the appeal by an opinion which is set out in full in the margin.[3]

Pierce filed a petition for a writ of habeas corpus in the Utah Supreme Court which on the same day was denied, it being considered by that court as a petition for rehearing in the appeal.[4] A petition for a writ of certiorari was then filed in the Supreme Court of the United States. On the 1st day of March, 1967, the Supreme Court entered its order denying the petition.[5] Mr. Justice Douglas in a

---

* Serving on assignment of the court without compensation.

1. The rule in *M'Naghten's* case, 10 Clark & Fin. 200, 8 Eng.Rep. 718 (1843), with the ingrafted "irresistible impulse" test, which in turn has been expanded in various jurisdictions, including Utah, into the "inability to control action or impulse by reason of mental disease (or condition)" test.

2. State of Utah v. Pierce, 17 Utah 2d 394, 412 P.2d 923.

3. "Appeal from a second degree murder conviction involving a glue-sniffing episode. Affirmed.

"Deceased and defendant,—teenagers, —sat in defendant's apartment sniffing glue. Defendant left and returned saying the deceased, whom he later stabbed, was crying, saying ghosts came in through the wall after he left, which ghosts were arguing whether deceased should go with the white or the colored people,—all hearsay volunteered by the defendant. Defendant said deceased asked him to turn the lights off 'til the ghosts returned. Next defendant said he saw the deceased bleeding when he turned the lights on. He fled and told officers he had attempted to stab the ghosts. The officers found deceased's wallet containing $25 on defendant at this time.

"Defendant urges that there was error in failure to 1) instruct about hallucinations, etc., 2) to instruct as to voluntary manslaughter, and others.

"We are unimpressed and see no error in this case. We affirm the jury's verdict and the court's judgment based thereon."

4. The court said:
"The petition for writ of habeas corpus is denied as it appears to petition for a rehearing of the matter which this court has decided. Remittitur issued in case number 10279 on May 3, 1966. Defendant has ninety days from that date to appeal to United States Supreme Court, and it is ordered that he be advised of this fact."

5. Pierce v. Turner, 386 U.S. 947, 87 S.Ct. 978, 17 L.Ed.2d 877.

written memorandum concurring in the denial, commented:

> "Denial of certiorari is proper in this case. I see no constitutional bar to a state court treating a petition for habeas corpus as a petition for rehearing where the habeas corpus petition raises the same questions as an earlier appeal. But federal habeas corpus is not so cramped, and the petitioner can, of course, petition a federal district court for a writ of habeas corpus. The underlying question is whether the *M'Naghten* test of legal insanity is a constitutionally permissible test of criminal liability in light of the contemporary state of knowledge on the problems of insanity. Should that test give way to the 128 years of experience in the fields of psychiatry and psychology since its formulation? Should it be replaced by the more sophisticated and realistic *Durham* test (Durham v. United States, 94 U.S.App.D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430) or some other test more in keeping with due process?"

Thereupon Pierce filed his petition for a writ of habeas corpus in this court, asserting that his constitutional rights were infringed in the state court proceeding by reason of the alleged denial to him of an effective jury trial and of due process and the equal protection of the laws, particularly because the jury was given no express instruction concerning the effect on criminal responsibility of delusions or hallucinations. It is not questioned that petitioner has exhausted his state remedies.

The cursory treatment in the State Supreme Court opinion of the problems here involved failed to afford the assurances contemplated by 28 U.S.C.A. § 2254 as amended by Pub.L. 89–711, 80 Stat. 1104,[6] for dispensing with a hearing in

a United States Court. Moreover, it seemed inappropriate summarily to reject as insubstantial the question raised in the memorandum accompanying the denial of certiorari by the Supreme Court of the United States.

Accordingly, an evidentiary hearing has been held, briefs have been filed and the case has been submitted for decision on the issues (I) whether the modern *M'Naghten* test of legal insanity was a constitutionally permissible one under the circumstances of this case and (II) whether the court's instruction concerning the legal effect of "voluntary intoxication" deprived plaintiff of due process by reason of any neutralizing effect it may have had on the insanity instruction or upon the petitioner's claim that he was not responsible for his acts because he was suffering from delusions or hallucinations as a result of "glue sniffing" and that anything in the instructions to the contrary constituted a deprivation of due process.

I

There is no necessity to recount in detail the circumstances of the killing revealed by the evidence before the state trial court. The opinion of the State Supreme Court quoted in the margin indicates broadly the nature of some of the evidence. It seems sufficient to add for the purpose of this opinion that there was competent evidence from which the jury could have believed that Pierce as a result of glue sniffing had been highly intoxicated, had suffered from hallucinations or delusions, had not intended to kill the victim and had not known what he was doing or that it was wrong. On the other hand, there was competent evidence from which it could have been believed that the effect of his glue sniffing was not such as to prevent him from knowing what he was doing or to know

---

6. "(d) In any proceeding instituted in a Federal court by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination after a hearing on the merits of a factual issue, made by a State court of competent jurisdiction in a proceeding to which the applicant for the writ and the State or an officer or agent thereof were parties, evidenced by a written finding, written opinion, or other reliable and adequate written indicia, shall be presumed to be correct, unless the applicant shall establish or it shall otherwise appear, or the respondent shall admit— * * * *"

that it was wrong; and the jury could have believed that the killing was intentionally accomplished with mercenary motive and that his claimed amnesia was a defensive afterthought. It is clear from the record that the petitioner had inhaled glue shortly prior to the killing, that he did, in fact, kill the deceased, and that the circumstances of the killing were bizarre and unusual.

No claim is made that the state court's instructions did not conform to the *M'Naghten* Rule, including its irresistible impulse extension, as applied generally in the Utah courts.[7] The able counsel for petitioner attacks the rule itself in this case upon the contentions that (a) there is widespread medical knowledge and general acceptance of the toxic psychosis resulting from the use of organic solvents such as toluene involved in glue sniffing; (b) that this knowledge was not acquired prior to 1960; (c) that the classical *M'Naghten* Rule has medical application only with respect to demented persons, possessing no reasonable diagnostic value when applied to toluene induced psychosis; and that the irresistible impulse test has no sound medical basis as a symptom of insanity; (d) that the psychological results from voluntary intoxication from alcohol and voluntary intoxication from toluene are markedly different, the former never producing psychosis short of withdrawal, and the latter producing a psychotic derangement not contemplated by its use; and (e) that only some legal test of insanity which would acquit one from responsibility for criminal conduct if at the time of such conduct, as a result of mental disease or defect, such person lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of law, would receive wide acceptance from the scientific community as a medically fair and reasonable test of insanity, including toxic psychosis.

A number of courts, indeed, of recent years have rejected *M'Naghten* as a proper test of criminal responsibility.[8] Yet

7. The court in receiving the testimony of one of the experts on the question of insanity during the trial, commented to the jury:

"THE COURT: Gentlemen of the jury, I ordinarily don't instruct jurors on matters like this during the trial because it is somewhat of a complicated affair. Legally speaking a man is insane if he comes within one of these three elements that go to constitute people that are insane. At the time of the commission of the offense if he is mentally incapacitated to the point that he is unable to understand the nature of his act then he is legally insane. Or, if he is unable to know that the act that he is doing is prohibited by morals or by law. Or three, if he is unable to control his actions by reason of his mental condition.

"If he meets any one of those three then he is legally insane, according to our definition of that subject. * * * "

Instruction 7a, given to the jury by the state court following the taking of testimony, but prior to the argument of counsel in accordance with the state practice, read as follows:

"You are instructed that if you have a reasonable doubt as to whether or not the defendant at the time of the alleged crime:

"1. Knew the nature of his act in stabbing the deceased; or

"2. That when he stabbed him he did not know it was wrong in the sense that such stabbing was condemned by morals or law; or

"3. That he was unable by reason of a mental disease to control his actions or impulses which killed the deceased:

"Then in either or all of these situations, the defendant would not be legally responsible for the death of the deceased, and you must find him not guilty."

8. See annotation "Modern Status of M'Naghten Right and Wrong Test of Criminal Responsibility", 45 A.L.R.2d 1447; United States v. Freeman, 357 F.2d 606 (2d Cir. 1966); United States v. Currens, 290 F.2d 751 (3d Cir. 1961); Durham v. United States, 94 U.S.App. D.C. 228, 214 F.2d 862, 45 A.L.R.2d 1430 (1954); State v. Davies, 146 Conn. 137, 148 A.2d 251, cert. denied 360 U.S. 921, 79 S.Ct. 1441, 3 L.Ed.2d 1537; Commonwealth v. McHoul, 226 N.E.2d 556 (Mass. 1967); State v. Shoffner, 31 Wis.2d 412, 143 N.W.2d 458 (1966); Vermont has abolished the *M'Naghten* Rule by statute and adopted the ALI rule. Vermont Statutes Anno. ¶ 13:4801–4802.

all of these decisions were by courts exercising supervisory powers over common law developments to be applied in inferior courts and none of them has been based upon a determination that utilization of the *M'Naghten* Rule constituted a deprivation of due process.

The last authoritative decision on the latter question appears to be that of the Supreme Court of the United States in 1952 [9] in which it was concluded that the *M'Naghten* Rule even without supplementation by the irresistible impulse doctrine did not violate due process. Mr. Justice Clark wrote for the court:

"* * * Knowledge of right and wrong is the exclusive test of criminal responsibility in a majority of American jurisdictions. The science of psychiatry has made tremendous strides since that test was laid down in M'Naghten's Case, but the progress of science has not reached a point where its learning would compel us to re-

quire the states to eliminate the right and wrong test from their criminal law. Moreover, choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy as to the extent to which that knowledge should determine criminal responsibility. This whole problem has evoked wide disagreement among those who have studied it. In these circumstances it is clear that adoption of the irresistible impulse test is not 'implicit in the concept of ordered liberty.'"

The leading case from the Tenth Circuit [10] also cited by the petitioner as a departure from *M'Naghten*, really seems more a restatement of that rule in modern context.[11] The Tenth Circuit in effect declined to follow the *Durham* and *Currens* statements and implied, it seems to me, that the modern *M'Naghten* Rule as encompassed in the trial court's instructions in both *Coffman* and *Wion* comports essentially with the ALI form-

---

9. Leland v. Oregon, 343 U.S. 790, 72 S.Ct. 1002, 96 L.Ed. 1302.

10. Wion v. United States, 325 F.2d 420 (10th Cir. 1963), cert. denied 377 U.S. 946, 84 S.Ct. 1354, 12 L.Ed.2d 309.

11. The Court of Appeals in *Wion* said: "The mental competency of the defendant to commit the offense charged was put in issue. And, the trial Court instructed the jury with commendable clarity, that the mental competency of the accused to commit the offense was an essential element of the crime charged, and like all other essential elements, must be proved by the Government beyond a reasonable doubt; that before convicting the accused, the jury must be satisfied beyond a reasonable doubt not only that the accused did the acts charged, which constitute the crime, but that they were done by a person mentally capable of committing the offense; and, that if they had a reasonable doubt of the defendant's mental competency at the time of the offense, he must be acquitted. The Court then proceeded to define mental incompetency in terms of criminal responsibility verbatim, in accordance with a recent decision of this Court, as meaning, '* * * such a perverted and deranged condition of the mental and moral facul-

ties as to render a person incapable of distinguishing between right and wrong, or unconscious at the time of the nature of his act, or though conscious of his conduct and able to distinguish between right and wrong, and knowing that the act is wrong, yet his will—by which is meant the governing power of his mind—has been involuntarily so completely destroyed that his actions are not subject to it but are beyond his control.' Coffman v. United States, 10 Cir., 290 F.2d 212, 215. More simply and understandably stated, the test is whether, at the time of the commission of the prohibited act, the accused was mentally capable of knowing and distinguishing the difference between right and wrong, and knowing that the act was wrong, was mentally capable of controlling his conduct. In legal parlance it may be referred to as the modern adaptation of the M'Naghten Rule, i.e., right-wrong, as modified and supplemented by the 'irresistible impulse test.' See: Feguer v. United States, 302 F.2d 214, 244, wherein the Eighth Circuit epitomizes the essential constituents of legal sanity, under the modern version of the M'Naghten Rule, as the defendant's 'cognition, volition and capacity to control' his behavior, or 'knowledge, will and choice.'"

ula.[12] While a more simple and meaningful restatement of *M'Naghten* was formulated in *Wion* which is now generally utilized by trial courts in this Circuit, the lower court's instructions, couched in the traditional words were not disapproved, the defendant's conviction being affirmed. Even the new formulation of the *M'Naghten* Rule in *Wion*, following the ALI approach that "a person is not criminally responsible for his conduct if, at the time of such conduct, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law," [13] does not seem to me to be substantially different than the charge given by the state trial court in the present case. There are varying nuances and emphases but the significance of such distinctions as those between "knowing", "appreciating", and "understanding", or between "inability to conform conduct" and "inability to control his actions", or between "illness", "disease", "condition", or "defect" are not such as likely to control the average juror in his ultimate decision.[14] They may control judges in the admission of evidence but as will be seen hereafter, we have no such problem here.

But irrespective of the view that may be taken of *Wion* otherwise, it seems clear that this decision in principle points up the lack of any due process problem in the state trial court's instruction before me.

Petitioner relies heavily upon United States v. Freeman, 357 F.2d 606 (2d

Cir. 1966), as demonstrating the inadequacies of the *M'Naghten Rule*. Judge Kaufman's brilliant historical review and scientific analysis present many arguments for the adoption by federal courts of a different statement in the development of the common law on the subject. The reason that the Second Circuit, in spite of the attack upon the scientific bases of *M'Naghten*, arrives at about the same point as that reached more directly by Chief Judge Murrah for the court in *Wion* rather than at a conclusion more in keeping with the psychiatric view which seems nearer *Durham* may be the inescapable consideration mentioned in *Leland*, supra: The choice of a test of legal sanity involves not only scientific knowledge but questions of basic policy concerning the extent to which that knowledge should govern criminal responsibility. Many of the attacks upon *M'Naghten* have been based upon the erroneous assumption that that rule was intended, and has been adopted and extended, as a definition of insanity rather than a statement definitive of criminal responsibility.[15]

In any event, as properly pointed out by Judge Kaufman in *Freeman*, "Our [the circuit court's] duty to supervise the administration of criminal justice in the courts of this Circuit can hardly be subject to the same restrictions as our power to impose constitutional requirements upon unwilling state tribunals."

 Within constitutional limitations, it is for the state itself to determine standards for criminal accountability free

---

12. Section 4.01 of the ALI Model Penal Code (1962 proposed final draft).

13. Compare the state court's statement to the jury during the course of the trial of the conditions under which Pierce would not be criminally responsible if "At the time of the commission of the offense he is mentally incapacitated to the point that he is unable to understand the nature of his act, then he is legally insane. Or if he is unable to know that the act that he is doing is prohibited by morals or by law. Or, three, if he is unable to control his actions by reason of his mental condition."

14. See Robitscher, Psychiatry and Changing Concepts of Criminal Responsibility, Federal Probation, Vol. XXXI, No. 3, Sept. 1967, pp. 45, 47.

15. It seems appropriate that this basis of *M'Naghten* should be pointed out by a writer in whom the disciplines of law and psychiatry have been united, Jonas Robitscher, J.D., M.D. See Robitscher, Psychiatry and Changing Concepts of Criminal Responsibility, Federal Probation, Vol. XXXI, No. 3, Sept. 1967, p. 45, supra.

from the views of federal judges who might be led by reason of their own supervisory powers within the federal system to espouse different standards there. A state may give support by its laws to its own public policies and necessities, and it may emphasize or subordinate medical knowledge, humanitarianism and sympathy, or the demands of public order as it chooses, so long as its laws or their applications do not offend fundamental principles of fairness and reason.

Nor need states look to psychiatrists rather than to legislators to write their laws, any more than state judges must seek controlling guides to their interpretation more in the medical journals than in the statutes and case books. The Constitution of the United States may not be interpreted to render the protection of society irrelevant to the definition of criminal responsibility. My conviction is that the gist of the M'Naghten test as encompassed in Wion represents an appropriate blend and reconciliation of humanitarianism, reason, social control, protection of society and natural justice, and that it has reasonably adapted itself, and continues relevant, to the expanding medical knowledge of the mind. Should I be wrong in this view, I am yet convinced that the difference between it and the most critical view of M'Naghten would not carry the case beyond the bounds of due process or render it one of cruel or unusual punishment proscribed by the Constitution.

## II

There remains a consideration of the propriety and effect of the state trial court's instruction on "voluntary intoxication", considered in context with the insanity charge. Again I accept as a proper test, in the words of petitioner's counsel, whether in the light of the contemporary state of knowledge on the problem of insanity and the effects of glue sniffing the court's instructions as a whole involved a denial of fundamental fairness or liberty shocking to the universal sense of justice.

Unlike the situation in *Freeman*, supra, where the federal trial judge rigidly restricted the evidence of the psychiatrists to that directly relevant to the right and wrong test, the evidence received by the trial court in the case at bar was of broad range, and thoroughly explored the contemporary state of knowledge concerning toluene and its effects. Emphasis has been placed by petitioner's counsel upon the possible effects of glue sniffing as indicated by recent observations and studies. As indicating the contemporary state of knowledge in this field a recent study concerning Solvent Sniffing,[16] which was co-authored by one of the witnesses in the state court trial, was introduced in evidence here. While this article was published after the trial, I perceive no significant aspects of the psychologic and toxicologic effects of glue sniffing that were not fairly developed before the state court jury,[17] Dr. Done

16. Press and Done, "Solvent Sniffing, Pediatrics," Vol. 39, Nos. 3 and 4, March and April, 1967, p. 451.

17. Pertinent extracts from this study follow:
 "The immediate effects of inhaling the vapors of the substances mentioned above may vary from a state of inebriation resembling alcoholic intoxication to transient, overt psychotic behavior and psychotomimetic reactions. The results depend upon the intensity of exposure, the prior emotional and physical experience, and the premorbid personality of the individual. Feelings of drunkenness, dizziness, and euphoria develop almost universally. The euphoria is sometimes ac-companied by feelings of reckless abandon, grandiosity and omnipotence; a combination which would be expected to lead to impulsive or destructive behavior of the type mentioned above. Many of the subjects indicated that while under the influence they 'didn't care about anything,' felt 'stronger' and 'more intelligent than anyone in the world,' and many felt that there was nothing that they could not or should not do. Some describe the sensation of feeling 'blank,' 'numb,' or 'dead.' There frequently is a sense of floating, spinning, or magnetic pull. Distortions of space and visual perception are common, and we received numerous descriptions of the 'walls clos-

having then mentioned that this article was then under preparation.

The jury fairly had the benefit of the substance of the relevant current knowledge and its possible application to the circumstances of the killing. That the experts could not completely agree upon applications of current knowledge to the case at hand or that the jury did not adopt the views of some of the experts or all of the assumptions of fact on the basis of which they testified, is no reason to question the broad rule of criminal responsibility within the framework of which inquiry was made. As the Utah court noted in another case involving claimed intoxication and drug use, the jury did not have to blindly accept defendant's contentions, especially where other evidence of circumstances attending the crime rendered such contentions improbable.[18]

While the comments of Mr. Justice Douglas, supra, invited, and the petition and petitioner's brief in the case at bar make, a massive attack upon the modern *M'Naghten Rule* itself, perhaps the most questionable phase of the state court's proceedings involved the court's instruction concerning voluntary intoxication.[19]

ing in,' and 'sky falling,' and visible objects changing size, shape, and sometimes color. Some describe objects about them taking on vivid and beautiful colors. One boy's glue tube turned into an ice cream cone, another's desk became a baby carriage, and still another perceived the transformation of a picket fence to a group of live soldiers.

"Visual, and less commonly, auditory, hallucinations occur, but apparently only in certain susceptible individuals. That is, some of our subjects routinely experienced such phenomena, whereas others never did regardless of the intensity of exposure, even to the point of unconsciousness. The hallucinations are usually in vivid colors, and fire plays a prominent role in them. Thus, various subjects have described themselves as being 'surrounded by fire,' having molten metal poured over them, diving into a lava pit or volcano, etc. Some subjects reported hearing sirens (apparently not tinnitus because the sound has a definite undulating quality) and some hear music.

"Tolan and Lingl found that the effects of gasoline sniffing compared closely with the psychotic syndromes produced by mescaline, lysergic acid diethylamide (LSD), and psilocybin. (Indirect confirmation of this may be noted by reports of the use of morning glory seeds and nutmeg to achieve similar hallucinations.) In our experience such psychotomimetic effects are true of toluene inhalation as well. Lawton and Malmquist also reported hallucinations in gasoline sniffers as did Ackerly and Gibson in lighter fluid sniffers. It is apparent that the tendency of many to equate the effects of these chemicals with those produced by alcohol is unwarranted, at least among many sniffers. The potential differences, aside from the psychotomimetic effects, include more striking feelings of euphoria, grandiosity, and recklessness and, apparently, a greater loss of self-control. As with other psychotomimetic syndromes, amnesia for the events surrounding the intoxication is common. It is noteworthy, however, that this is usually a spotty amnesia such that some events will be recalled, while others will not. The hallucinatory experiences are augmented by a diminution of external stimuli such as turning out the lights and, conversely, the presence of external stimuli may tend to draw the individual back into the realm of reality. The duration of acute effects varies greatly, depending upon the intensity of exposure, and may range from 15 minutes to a few hours. Sniffing activities are frequently associated with marked anorexia, and some of the more avid sniffers have become nearly cachectic as a result. Our experience and published data are not sufficient to determine which of these effects, except for the narcotic ones, are shared by the other solvents in Table III."

18. State v. Diaz, 76 Utah 463, 290 P. 727.

19. This instruction immediately followed the one dealing with insanity and was as follows:

"Under the laws of the State of Utah no act committed by a person while in a state of voluntary intoxication induced by the use of toluene is less criminal by reason of his having been in such condition, except that the jury may take into consideration the evidence of intoxication on the part of the accused in connection with determining the intent with which any particular act may have been committed.

"Being in a state of voluntary intoxication is no excuse for the commission of a crime where it merely makes a per-

This narrower question is not argued at length in the briefs, but the position of petitioner as I understand it is that the "voluntary intoxication" instruction at least tended to neutralize the "insanity" instruction even though the latter is interpreted as rendering relevant the testimony concerning the effects of glue sniffing. In other words, is it possible that under the court's instructions the jury may have found that the defendant was insane by M'Naghten standards as a result of glue sniffing and yet criminally responsible since his condition was the result of "voluntary intoxication"?

It seems probable that both the state court and jury accepted the defendant's claimed condition from glue sniffing to be one resulting from "voluntary intoxication."[20] There was no evidence of the inbibing or inhalation of any intoxicating agent other than toluene. Dr. Done's article referred to "intoxication" from "solvent sniffing" in the "voluntary" context.[21] Intoxication from glue sniffing may differ in effect from other types of intoxication, but it is nonetheless intoxication which, if voluntary, clearly falls within the purpose, reach and application of the general principle involved in the instructions.

■■ The voluntary intoxication instruction does not appear to have preempted the area covered by the insanity instruction nor to have neutralized the latter. The instructions were to be read as a whole, and the very fact that the insanity instruction was given was an indication to the jury that it covered rules of law not encompassed by the voluntary intoxication instruction. The arguments of counsel to the jury, while understandingly emphasizing different phases of the instructions, did not preclude the jury's consideration of both instructions.[22]

son more excited or reckless, so that he does things he might not have otherwise have done, and it may even make the commission of an offense more grave than it otherwise would be, but if the defendant was so intoxicated at the time of the alleged offense that he did not know what he was doing, or was so intoxicated that he was incapable of forming an intent to commit the offense charged, then he would not be guilty of the offense."

20. While there was an attempt made in connection with the examination of certain expert witnesses to demonstrate that glue sniffing might be addictive and that therefore the defendant's intoxication might not be deemed voluntary, no point was made of this in the arguments, nor were any instructions requested or excepted to on such a theory. The failure to define "voluntary" or further instruct on the "voluntary" concept would seem to constitute mere error at most, and not to raise any constitutional problem. Nor has the petitioner made any such contention here.

21. The complete title of the article: "Solvent Sniffing—Psychologic Effects and Community Control Measures for Intoxication from the Intentional Inhalation of Organic Solvents".

22. In the closing argument counsel for the defendant, among other things, stated to the jury as follows:

" * * * You heard Judge VanCott, himself, ask Dr. Lydon D. Clark about an area of great importance in this case, wherein a person might know what he is doing, yet might not be able to control his acts and still later forget what he did while he was under the influence of toluene. And you heard Dr. Clark's answer. Further you heard Judge VanCott's instructions that if you have any reasonable doubt as to 1, whether or not Ray Pierce understood the nature of his act you must find him not guilty. 2. If you have any reasonable doubt that Ray Pierce did not know right from wrong relative to his act you must find him not guilty. And 3. If you have any reasonable doubt as to whether or not Ray Pierce was suffering from a mental disease that caused him to not have control of his impulses, you must find him not guilty. 4. If you have any reasonable doubt that Ray Pierce was unable to plan, design, think out beforehand, weigh consequences, a choice to kill or not to kill, you must find him not guilty. 5. If you have any reasonable doubt that Ray Pierce did not deliberate and do so beforehand, which is the necessary element of malice, you must find him not guilty. 6. If you have any reasonable doubt that Ray Pierce had the specific intent to kill Kenny Vaught you must find him not guilty. 7. If you have any reasonable doubt that Ray Pierce did not have the specific intent to do great bodily

Moreover, the instruction on voluntary intoxication as well as other instructions of the court,[23] emphasized under any view the essential element of specific in-

harm to Kenny Vaught you must find him not guilty. 8. If you have any reasonable doubt that Ray Pierce did not have the specific intent to do a dangerous act, the natural and possible consequences of same resulting in death to Kenny Vaught, you must find him not guilty. * * * The Doctors Done and Mohr and Clark should have left no doubt in your mind that Ray Pierce was temporarily insane. The State of Utah with the burden of proving beyond a reasonable doubt that Ray Pierce was at that time sane brought forth Dr. Moench. Dr. Moench saw this boy and limited to what this boy told him over a period of an hour and one half, coupled with the admission from Dr. Moench, that he knew nothing about the effects of toluene, is all the State brought forward to prove beyond a reasonable doubt that Ray Pierce was not at that time temporarily insane."

While emphasis was placed by the prosecuting attorney in his argument upon the voluntary intoxication instruction, he recognized that "if the Defendant was so intoxicated at the time of the alleged offense that he did not know what he was doing, or was so intoxicated that he was incapable of forming an intent to commit the offense (which was the stabbing) then he is not guilty." And he added that "If you don't believe that this man knew what he was doing when he struck that knife into Kenny Vaught's heart, you should acquit him". After the prosecutor had thus emphasized the intoxication instruction, and immediately following this emphasis, he stated: "There is one thing here—you should take all these instructions into consideration together, not isolate them. Even though I only point out one I don't intend to say that is the only one to apply because they are all to be applied to this particular case."

**23.** Other instructions of the court bear upon the question of intent or state of mind. Thus in instruction number 8 the jury was instructed:

"Motive is not an element of the crime charged and need not be shown. However, you may consider the motive or lack of motive as a circumstance in this case.

"Presence of motive may tend to establish guilt. Absence of motive may tend to establish innocence. You will, therefore, give its presence or absence, as the case may be, the weight to which you find it to be entitled."

"Instruction No. 9.

"The law presumes that a person intends the ordinary, natural and probable consequences of his voluntary acts. This is a disputable presumption and may be overcome by evidence to the contrary.

"If you should find that the defendant killed, then in determining the question of intent it is important that you consider the means by which the killing was accomplished. If you should find that he used a deadly weapon without excuse or provocation and in such a manner as to imperil life, such facts would support an inference of felonious intent; an inference which, however, must be weighed against any contrary evidence.

"If and when the evidence shows that one person assailed another violently with a dangerous weapon in a manner likely to cause the death of the person assailed and which, in fact, did kill the person thus attacked, such evidence gives rise to a presumption that the assailant intended death, or other great bodily harm.

"That presumption, however, may be overcome by contrary evidence; and any such evidence is sufficient to overcome it which creates in the minds of the jurors a reasonable doubt that the defendant's intent was as so presumed. In the absence of evidence to the contrary the presumption must prevail."

In instruction number 10 the jury was instructed among other things as follows:

"The words 'wilful' and 'wilfully' when applied to the intent with which an act is done imply simply a purpose or willingness to commit the act and do not require any intention to violate the law; or to injure another, or to acquire advantage. * * *

"The word 'intent' means intention, design, resolved (sic); a determination of the mind.

"The term 'specific intent' means a fixed direction of the mind to a particular object, or a determination to act in a particular manner."

The jury theretofore had been instructed in instruction number 5 as follows:

"Before you can find the defendant guilty of murder in the second degree, you must believe from the evidence in this case and beyond a reasonable doubt the following:

"1. That on or about the 28th day of May, 1964, at Salt Lake County, State of Utah, the defendant Ray Wayne Pierce killed Kenneth Jack Vaught;

tent which in the context of the evidence could not have been deemed present had the jury accepted the defendant's version of how the killing took place. It is apparent that the jury did not do so, nor in view of the conflicting evidence and permissible inferences did it have to. On the record I believe that the defendant probably received greater consideration than the Constitution or the statutes of Utah entitled him to—the benefit of the *M'Naghten Rule* in spite of the fact that his "insanity", if any, was admittedly temporary at most and was caused entirely from his voluntary intoxication.[24]

Even if the instructions taken as a whole were susceptible of the construction that voluntary intoxication through glue sniffing would not constitute a defense under the theory of "insanity" if the jury found beyond a reasonable doubt that the defendant had both malice and the specific intent to kill the deceased. I do not believe any constitutional right of the defendant would have been violated. The principle in the voluntary intoxication charge is found not only in the Utah statute [25] but is a common law principle which when properly applied seems essential to the proper protection of society.[26] Intoxication is not limited to that brought about by in-

toxicating liquor but may include intoxication by drugs.[27] There is no claim in this case, nor does the expert testimony suggest, that petitioner's intoxication, or the mental condition resulting therefrom, was anything but transitory. The rule has been uniform that insanity brought about by transitory voluntary intoxication is no defense to homicide.[28] The application of the statutory test in this connection should not be made to depend upon theoretical or practical similarity between the effects of mental illness and intoxication, but rests upon the right of the state to define criminal responsibility in keeping with elementary principles of fairness, justice and order. As applied to such a case as this, these principles would not have been violated by the conviction of a defendant who possessed, and carried out with malice aforethought, the specific intent to kill another human being; but elementary principles of justice, fairness and good order would in my opinion be offended by the acceptance as constitutionally required of the proposition that such conduct, or similar conduct by persons who have voluntarily placed themselves under the temporary influence of drugs is beyond the reach of penal sanctions.

---

"2. That the killing was with malice aforethought;

"3. That when the defendant struck with the fatal knife he had a specific design or intention, thought out beforehand, to cause great bodily injury to the deceased, or an intention or design thought out beforehand to do an act, knowing the reasonable and natural consequences thereof would be likely to cause great bodily injury to the deceased;

"4. That the killing was unlawful;

"5. That the said Kenneth Jack Vaught died within a year and a day after the cause of death was administered.

"The burden is upon the state to prove to your satisfaction and beyond a reasonable doubt that all of the foregoing elements of the crime of murder in the second degree are present in this case, and if the State shall have failed to so satisfy your minds upon one or more of the

aforesaid elements, you cannot find the defendant guilty of murder in the second degree. * * * "

24. See McIntyre v. State, 379 P.2d 615, 8 A.L.R.3d 1231 (Alaska 1963).

25. Utah Code Annotated 1953, 76–1–22, taken from Deering's Cal.Penal Code, ¶ 22.

26. See annotation, Voluntary Intoxication as a Defense to Homicide, 79 A.L.R. 897; Hopt v. People, 104 U.S. 631, 26 L.Ed. 873.

27. Wharton's Criminal Law (Anderson) ¶ 49; People v. Sameniego, 118 Cal.App. 165, 4 P.2d 809 (1931); People v. Lim Dum Dong, 26 Cal.App.2d 135, 78 P.2d 1026 (1938).

28. People v. Travers, 88 Cal. 233, 26 P. 88 (1891); People v. Fellows, 122 Cal. 233, 54 P. 830; Anno. 12 A.L.R. 861, 895.

The more difficult problems of what is "involuntary",[29] particularly in the context of addiction, the extent of constitutionally permissible punishment for various acts committed while a person is intoxicated, organic or permanent brain damage or illness resulting from intoxication, as distinguished from the transitory effects of voluntary intoxication,[30] punishment of a status, as such, apart from the commission with specific intent of an affirmative criminal act [31] or the question of mere error subject only to direct appeal as distinguished from constitutional infirmity, are not involved or reached in this case.

For the foregoing reasons the petition for writ of habeas corpus herein is denied and the petition is dismissed.

29. 1 Wharton's Criminal Law (Anderson) ¶ 47. See also Anno. When Intoxication Deemed Involuntary, 30 A.L.R. 761.

30. See State v. Clokey, 83 Idaho 322, 364 P.2d 159 (1961).

31. Cf. Robinson v. State of California, 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) ; Driver v. Hinnant, 356 F.2d 761 (4th Cir. 1966) ; Easter v. District, 124 U.S.App.D.C. 33, 361 F.2d 50 (D.C.Cir. 1966)