UNITED STATES of America, Appellee,

v.

Arthur HANSEN, Defendant-Appellant.

No. 803, Docket 81–1335.

United States Court of Appeals,
Second Circuit.

Submitted Nov. 9, 1982.

Decided March 4, 1983.

Barry Bassis, The Legal Aid Society, Federal Defender Services Unit, New York City, submitted a brief, for defendant-appellant.

George W.F. Cook, U.S. Atty., and P. Scott McGee, Asst. U.S. Atty., Burlington, Vt., submitted a brief, for appellee.

Before NEWMAN and CARDAMONE, Circuit Judges, and BURNS,* District Judge.

NEWMAN, Circuit Judge:

This appeal from a conviction in a criminal case, now before us on a petition for

* The Honorable Ellen Bree Burns of the United States District Court for the District of Connecticut, sitting by designation.

rehearing, poses unusual aspects of the always troubling matter of the insanity defense. Arthur Hansen appeals from a judgment of the District Court for the District of Vermont (Albert D. Coffrin, Judge) convicting him, after a bench trial, of two counts of federal firearms violations. Count I charged Hansen with falsely denying that he was a mental patient at the time he purchased a firearm, in violation of 18 U.S.C. §§ 922(a)(6), (d)(4), 924(a) (1976), and Count II charged him with receiving a firearm after being committed to a mental institution, in violation of 18 U.S.C. §§ 922(h)(4), 924(a) (1976). Judge Coffrin imposed maximum sentences of five years on each count and ordered them to be served consecutively for an aggregate sentence of ten years. The bizarre nature of the case can readily be appreciated with knowledge of just the essential factual context in which the violations occurred: while involuntarily confined at the Vermont State Hospital and Mental Institution, Hansen made a suicide pact with his friend, Danny Ramirez, another inmate of the hospital, procured a weapon for their use, watched Ramirez use the weapon to take his own life, and then, apparently jolted by the horror of the scene, declined to complete the dreadful bargain. We readily acknowledge that the extraordinary circumstances that have befallen this deeply disturbed young man have caused us to give the matter extended reflection. Though we initially affirmed the judgment by summary order, 688 F.2d 817, we now conclude that the appropriate disposition is to vacate the sentence and remand for resentencing in light of the considerations set forth in this opinion.

I.

At our initial consideration of the appeal, we were asked to rule that the evidence was insufficient as a matter of law to permit a finding that the Government had sustained its burden of proof under the

test of criminal responsibility prevailing in this Circuit. *See United States v. Freeman,* 357 F.2d 606, 622 (2d Cir.1966). Appellant contended that by reason of a mental disease or defect he lacked substantial capacity to conform his conduct to the requirements of law, and that the evidence was insufficient as a matter of law to permit a reasonable fact-finder to conclude that the Government had proved his responsibility under the *Freeman* test beyond a reasonable doubt. *See United States v. Taylor,* 464 F.2d 240 (2d Cir.1972).

The District Court heard the testimony of four psychiatrists. Though all four agreed that Hansen suffers from a severe form of schizophrenia, they differed in their ultimate conclusions as to the effect of his illness upon his conduct. We were satisfied at the initial hearing of the appeal that the testimony of Dr. John Ives, testifying for the Government, adequately supported the District Court's finding of criminal responsibility, and our review of the record in light of the contentions advanced by defendant in his petition for rehearing have not altered our conclusion. Moreover, we adhere to the view, previously expressed in our summary order, that the testimony of some of the doctors who differed with Dr. Ives contained elements that permitted the trier of fact to discount the force of their ultimate conclusions.

However, our reexamination of the record occasioned by the petition for rehearing has brought to the fore an issue that deserves further consideration: whether a

sentence for conduct for which a defendant is criminally responsible may be enhanced, within statutory limits, on the basis of additional conduct for which the defendant might not be criminally responsible. We asked the parties to present additional briefs on this issue and its pertinence to the facts of this case.

## II.

The insanity defense in Anglo-American criminal jurisprudence has been consistent in its focus upon the mental state of the accused in relation to the conduct constituting the offense charged. Though the standards of the law of civil commitment focus on the mental state of the individual unrelated to any specific conduct, *e.g.,* Vt.Stat. Ann. tit. 18, §§ 7504–7505 (1968 & Supp. 1982); *see Developments in the Law—Civil Commitment of the Mentally Ill,* 87 Harv.L. Rev. 1190, 1201–07 (1974), the criminal law, responding to the occurrence that warrants the law's intervention, has not inquired whether the mental state of the accused generally precludes responsibility for criminal conduct, but concerns itself precisely with the mental state of the accused in the doing of the proscribed act. This approach was evident in the *M'Naghten* Rule[1] and has been a central ingredient of the various subsequent formulations of the insanity defense,[2] including the standard of the American Law Institute,[3] currently adopted in this Circuit, *see United States v. Freeman, supra,* 357 F.2d at 625–26.

---

1. "[I]t must be clearly proved that, at the time of the committing of the act, the party accused was labouring·under such a defect of reason, from disease of the mind, as not to know the nature and quality of *the act he was doing,* or, if he did know it, that he did not know he was doing what was *wrong." M'Naghten's Case,* 10 Clark & Fin. 200, 210, 8 Eng.Rep. 718, 722 (H.L. 1843) (emphasis added).

2. See, for example, the "irresistible impulse" test, supplementing the *M'Naghten* "right-wrong" test, *see Smith v. United States,* 36 F.2d 548, 549 (D.C.Cir.1929) ("The modern doctrine is that the degree of insanity which will relieve the accused of the consequences of a criminal act must be such as to create in his mind an uncontrollable impulse to commit *the*

offense *charged.")* (emphasis added), and the *Durham* test, displacing the *M'Naghten* test in the District of Columbia from 1954 to 1972, *see Durham v. United States,* 214 F.2d 862, 874–75 (D.C.Cir.1954) ("[A]n accused is not criminally responsible if *his unlawful act* was the product of mental disease or defect.") (emphasis added).

3. "A person is not responsible for criminal conduct if at the time of such conduct as a result of mental disease or defect he lacks substantial capacity either to appreciate the criminality *of his conduct* or to conform *his conduct* to the requirements of the law." Model Penal Code § 4.01(1) (Final Draft 1962) (emphasis added).

Hansen's conviction illustrates the full rigor of the doctrine that confines the insanity defense to conduct constituting the offense charged. Hansen is sufficiently insane to have been committed to a state mental hospital. Moreover, there is the distinct possibility, not precluded by any finding that has yet been made, that Hansen could not be found criminally responsible for the overall course of conduct that resulted in the death of his friend. That is to say, if the State of Vermont had endeavored to prosecute Hansen on state charges of contributing to the death of Ramirez, we cannot be certain whether evidence would prove beyond a reasonable doubt that Hansen had substantial capacity to conform his conduct to the law's requirements with respect to making the suicide pact and furnishing the gun to Ramirez, knowing of his friend's intended use. Nevertheless Hansen has been validly convicted of two discrete acts committed in the course of a sequence of larger events for which his criminal responsibility has not been proven and perhaps could not be proven. These circumstances are unusual because in this case the acts constituting the offenses charged, though significant, are in themselves far less serious than the consequences of the acts, whereas in most cases involving the insanity defense, the conduct that is the offense is not only serious on its own terms but also generally far more serious than other acts of the accused that may be offered as evidence of insanity.

As an initial proposition, it might have been maintained that the insanity defense should be available to an accused who can put in issue his impaired mental state in relation to either the precise acts constituting the crime charged or the course of conduct of which those acts were a part.[4]

But the entire development of the insanity defense has focused on the condition of the accused's mind in relation to only the acts constituting the offense charged, and we accept that focused relationship as a limitation inherent in the defense. That very limitation, however, prompts our further inquiry into the permissible adverse use at sentencing of conduct for which an accused might not be criminally responsible.[5]

### III.

As a general matter a sentencing judge has broad discretion to consider all aspects of a defendant's conduct. *United States v. Tucker,* 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972); *United States v. Sweig,* 454 F.2d 181, 183–84 (2d Cir.1972); 18 U.S.C. § 3577 (1976). However, when sentences have been enhanced because of conduct other than that for which the defendant was convicted, the responses of appellate courts have not been uniform. On the one hand, a sentencing judge has been permitted to consider evidence of other crimes for which the defendant was neither tried nor convicted, *United States v. Cifarelli,* 401 F.2d 512, 514 (2d Cir.) (per curiam), *cert. denied,* 393 U.S. 987, 89 S.Ct. 465, 21 L.Ed.2d 448 (1968), or for which charges were brought and dismissed, *United States v. Doyle,* 348 F.2d 715 (2d Cir.), *cert. denied,* 382 U.S. 843, 86 S.Ct. 89, 15 L.Ed.2d 84 (1965), or for which a trial resulted in an acquittal, *United States v. Sweig, supra,* 454 F.2d at 184. On the other hand, a sentencing judge may not consider prior convictions unconstitutionally obtained, *United States v. Tucker, supra,* 404 U.S. at 447–49, 92 S.Ct. at 591–92; *McGee v. United States,* 462 F.2d 243, 245 (2d Cir. 1972), and may not enhance a sentence be-

---

4. It would, of course, be entirely inadmissible to maintain that an impaired mental state with respect to a specific act should insulate an accused from responsibility for unrelated conduct. *See United States v. Brawner,* 471 F.2d 969, 991 (D.C.Cir.1972) (en banc) ("Presumably the mental disease of a kleptomaniac does not entail as a 'result' a lack of capacity to conform to the law prohibiting rape.").

5. We are not concerned with a situation in which a convicted defendant, endeavoring to mitigate a sentence, offers evidence of bizarre behavior to show a mental impairment that might justify leniency, thereby accepting the risk that such conduct might be perceived as an aggravating circumstance. *See Granviel v. Estelle,* 655 F.2d 673, 675–76 (5th Cir.1981), *cert. denied,* 455 U.S. 1003, 102 S.Ct. 1636, 71 L.Ed.2d 870 (1982).

cause of a defendant's refusal to implicate his confederates, *United States v. Bradford,* 645 F.2d 115, 117 (2d Cir.1981); *DiGiovanni v. United States,* 596 F.2d 74, 75 (2d Cir. 1979), though lack of cooperation may apparently be assessed along with other factors, *United States v. Bradford, supra,* 645 F.2d at 117; *United States v. Barnes,* 604 F.2d 121, 154 (2d Cir.1979), *cert. denied,* 446 U.S. 907, 100 S.Ct. 1833, 64 L.Ed.2d 260 (1980).

Whether or not these decisions can all be harmonized, those that approve consideration by a sentencing judge of conduct collateral to the primary conduct for which the defendant was convicted have not always articulated the rationale for doing so. Some light is shed by the Supreme Court's decision in *North Carolina v. Pearce,* 395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), in which the Court outlined the circumstances in which a sentencing judge may impose a higher sentence after retrial than the sentence imposed upon an initial conviction that was reversed on appeal. An increased sentence is permitted if the sentencing judge imposes it for reasons that relate to "identifiable conduct on the part of the defendant occurring after the time of the original sentencing proceeding." *Id.* at 726, 89 S.Ct. at 2081. *Pearce* illuminates our problem in several respects. First, the Court has made clear that collateral conduct can provide the basis for a discrete increment beyond the sentence that would be imposed in its absence.[6] Second, the Court has indicated that the purpose of considering the collateral conduct is to gain a fuller assessment of the defendant so that the punishment will " 'fit the offender and not merely the crime' " for which he was convicted. *Id.* at 723, 89 S.Ct. at 2079

(quoting *Williams v. New York,* 337 U.S. 241, 247, 69 S.Ct. 1079, 1083, 93 L.Ed. 1337 (1949)). The collateral conduct "may have thrown new light upon the defendant's 'life, health, habits, conduct, and mental and moral propensities.' " *Id.* (quoting *Williams v. New York, supra,* 337 U.S. at 245, 69 S.Ct. at 1082). Third, the Court has cautioned that when there arises a risk that an increment of a sentence might have been impermissibly included to punish a defendant for conduct that is not blameworthy, a sentencing court may be obliged to articulate its reasons for adding the increment to ensure that only permissible considerations underlie it. In *Pearce* the conduct that the Court sought to ensure would not be the occasion for increased punishment was the defendant's exercise of his statutory right to appeal his initial conviction. *Pearce* is therefore not directly analogous to our case because even if an increment of Hansen's sentence was imposed because of the consequences of his criminal conduct, there is no risk whatever of penalizing him for conduct protected by state law. Nevertheless, *Pearce* is instructive in pointing out the value of articulated reasons for a sentence in those special circumstances where a sentence imposed without explanation creates a risk that the sentence may have been based in part on an impermissible factor.

The issue we confront concerns collateral conduct that might never result in conviction because of the insanity defense. In some circumstances, the law permits enhancement of punishment for conduct that could not be the basis of a valid conviction. Acts of juvenile delinquency, committed below the age at which the law permits conviction and imposition of sentence, may nonetheless enhance the sen-

---

**6.** In the context of a resentencing after a successful appeal and a subsequent conviction, the Court in *Pearce* confined consideration of collateral conduct for purposes of an increased sentence to conduct occurring after the original sentencing. *See North Carolina v. Pearce, supra,* 395 U.S. at 726, 89 S.Ct. at 2081. The limitation is stated in the majority opinion and made emphatic by comparison with the partial concurrence of Justice White, *see id.* at 751, 89 S.Ct. at 2088 (expressing view that an in-

creased sentence should be permissible "based on any objective, identifiable factual data not known to the trial judge at the time of the original sentencing proceeding"). This limitation may reflect apprehension that reliance on "newly discovered" facts occurring prior to the original sentence might too easily disguise an intention to punish for exercising a right of appeal, or, at a minimum, might be perceived by potential appellants as serving such an impermissible purpose and thereby deter appeals.

tence of an adult offender. *See, e.g., United States v. Madison,* 689 F.2d 1300, 1315 (7th Cir.1982); cases cited in Annot., 64 A.L.R.3d 1291 (1975). A sentence may be enhanced because of conduct for which prosecution is barred by the pertinent statute of limitations. *See, e.g., United States v. Wondrack,* 578 F.2d 808 (9th Cir.1978) (court enhanced sentence of defendant convicted of tax fraud because unreported income was result of illegal activities, for which defendant had never been indicted and on which the statute of limitations had apparently run at the time of sentencing). A sentencing judge may take into account a defendant's habitual association with known criminals, although prosecution for such conduct would encounter substantial constitutional objections. Each of these illustrations, however, differs from the problem we confront in a significant respect: the defendant bears in some sense a moral responsibility for the conduct considered by the sentencing judge, even though the law elects not to permit conviction and punishment for such conduct.[7] But conduct committed when the requisite mental state is lacking due to insanity is conduct for which the law recognizes no moral responsibility at all.

More pertinent to our problem is the permissible use at sentencing of conditions affecting the defendant that could not be the basis for the imposition of penal sanctions. For example, sentencing judges frequently consider a defendant's addiction to narcotics or alcohol, though such a status cannot be the basis of a criminal conviction, *see Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962). A defendant's illiteracy or lack of job skills also illustrates the point. Though the rationale for reliance on such conditions in formulating a sentence are rarely articulated, it seems evident that the legitimacy of such considerations derives primarily from their relationship to the permissible sentencing objective of rehabilitation. Surely a sentence would encounter serious objections if it were enhanced because of addiction or illiteracy to achieve such sentencing objectives as retribution, denunciation, or specific or general deterrence. These sentencing objectives are generally thought to be permissible only with respect to conduct for which the defendant is blameworthy.

It is a fundamental principle of criminal law that a person may not be held legally responsible for conduct unless his mental state meets the prevailing standard of legal sanity.[8] We think the same principle that requires a finding of criminal responsibility before a conviction may be obtained exerts a substantial caution against the enhancement of a sentence because of conduct for which the defendant was not criminally responsible. To countenance unfettered use of such conduct to enhance punishment would be to ignore "the long unbroken tradition of the criminal law that harsh sanctions should not be imposed where moral culpability is lacking." *Lennon v. Immigration and Naturalization Service,* 527 F.2d 187, 193 (2d Cir.1975). We do not doubt that a sentencing judge may consider the mental state of a defendant and any acts of misconduct he may have committed in assessing his need for rehabilitation and his potential dangerousness. The legitimacy of such consideration, however, does not warrant condemnation for conduct for which the defendant bears no criminal responsibility. When the Supreme Court in *Williams v. New York, supra,* and in *North Carolina v. Pearce, supra,* recognizes that collateral conduct may throw light on a defendant's "moral propensities," it cannot mean that a defendant is to be

**7.** Attributing a moral responsibility to a juvenile delinquent with respect to acts of misconduct is appropriate for youths of sufficient age to have the requisite mens rea, an age the common law thought was seven, *In re Gault,* 387 U.S. 1, 16, 87 S.Ct. 1428, 1437, 18 L.Ed.2d 527 (1967).

**8.** "The courts have emphasized over the centuries that 'free will' is the postulate of responsibility under our jurisdiction. 4 Blackstone's Commentaries 27.... The concept of lack of 'free will' is both the root of origin of the insanity defense and the line of its growth." *United States v. Brawner, supra,* 471 F.2d at 985–86 (footnote omitted).

adjudged morally less worthy because of some insane act. To enhance a sentence for conduct that was the product of insanity in order to achieve the punitive purposes of sentencing would be as intolerable as aggravating a sentence for acts done under threat of imminent death or serious bodily injury.

■ The point we make is a very narrow one. We intend no limitation on the broad discretion of sentencing judges in the general run of cases, and even in unusual cases like Hansen's, where the record reveals conduct, beyond the offenses charged, as to which there is a serious issue of criminal responsibility, we do not preclude the sentencing judge's consideration of such conduct in selecting a sentence that meets the defendant's need for rehabilitation and treatment or the community's need for protection. Our only concern is that conduct that may have been the product of mental illness should not result in a sentence enhanced in order to achieve those punitive purposes of sentencing traditionally associated with conduct for which an individual may properly be held responsible.

### IV.

■ In this case, the record raises a substantial question whether the decision of the sentencing judge to impose a maximum aggregate sentence of ten years may have improperly penalized the defendant for his conduct in making and endeavoring to carry out a suicide pact, conduct for which he might not be criminally responsible by reason of mental illness. We turn our attention first to the considerations articulated by the District Judge in imposing sentence and then to the state of the record concerning Hansen's responsibility for any conduct other than the bare acts of procuring the firearm and falsifying the application for it.

Judge Coffrin obviously faced a difficult task in selecting an appropriate sentence for Arthur Hansen. At least three circumstances were available for consideration. First, Hansen stood convicted of two federal firearms offenses for which the maximum aggregate penalty was ten years.

Though those offenses were significant in themselves, their elements did not include any infliction of harm against another person. As defense counsel pointed out at sentencing, sentences for obtaining a firearm by a false statement are frequently lenient, and probation is not unusual. Second, Hansen suffered from a serious mental illness, which inevitably occasioned both concern for his unfortunate plight and apprehension over the risks he posed to himself and other persons. Third, Hansen had been a participant in a course of conduct that had resulted in the death of his friend. As the prosecutor argued at the sentence hearing, Hansen's acts on the day of the offense "were knowingly done not just to get Mr. Hansen a gun, but for a very abhorent [sic] purpose which resulted in the death of another patient at the hospital."

Facing these considerations, Judge Coffrin could not fail to have been moved by the difficulties presented, and his colloquies with counsel and the defendant reflect an earnest effort to approach his unenviable task with care and sensitivity. The death of Hansen's friend, and other violent episodes in Hansen's past, obviously weighed heavily with the District Judge, although he explicitly recognized that these were not matters for which Hansen was being sentenced. As he told defense counsel, "Well, of concern to the Court, and I will be quite frank with you, is the fact that Mr. Hansen has had a propensity in the past to be, more or less recent past, to at least be around where violent death has occurred on at least three occasions, and that is not what he is before the Court this afternoon charged with or being sentenced, but it is of concern to the Court that at least incidentally or coincidentally it has occurred.... [I]t is of concern to the Court when it comes to fashioning what would be an appropriate sentence." Speaking to the defendant, Judge Coffrin said, "I cannot impress upon you enough how concerned society has been with your problem, but also concerned with the results that have occurred when you fail to take your medication, or when you fail to respond to treatment ...." Though these

remarks acknowledge that the tragic death of Hansen's friend was not what Hansen was being sentenced for, they leave ambiguous the purposes for which the sentencing judge assessed the consequences of Hansen's conduct. From our review of the sentencing hearing we cannot be certain that the sentence was not enhanced to punish Hansen because of the consequences of his violations, specifically his activity in furnishing the firearm to his friend and thereby facilitating the friend's death. It is possible that Judge Coffrin conscientiously put aside any thought of penalizing Hansen for the consequences of his federal law violations and imposed the maximum ten-year sentence for Hansen's rehabilitation or out of concern that an extended period of incarceration was needed to safeguard the community from the risk of dangerous behavior. But the distinct possibility that the sentence was enhanced to punish Hansen because of his use of the firearm after its purchase, or at least hold him accountable for such conduct, prompts us to examine what the record reveals as to his criminal responsibility for such conduct.

Dr. Ives was the only medical expert who expressed an opinion that Hansen, though unquestionably suffering from a mental disease, did not lack substantial capacity to conform his conduct to the requirements of the law. Examination of his testimony leaves no doubt that he was willing to express this opinion only with respect to Hansen's precise conduct constituting the offenses charged—obtaining the firearm and falsifying his application for it. The following portions of his testimony make the point clear:

Q. [by the prosecutor] [W]ith respect to the second prong of [the *Freeman* test of criminal responsibility], specifically with respect to the criminal conduct in question, namely, the falsification of a federal firearms form in obtaining a firearm and with respect to the date and time which that conduct occurred, October 12th, 1979, in your opinion did the Defendant have or lack substantial capacity to conform his conduct to the requirements of the law?

A. With the question put in that particular narrow form, I would have to say that he did indeed have the capacity to conform his conduct to the requirements of the law. In other words, he may have very much been interested in suicide, but he could have done it by another means.

. . . .

Q. [by defense counsel] So basically, I think the most fair statement that could be made here, isn't it, that really you don't know whether Mr. Hansen could have conformed his conduct to the requirements of the law on the day in question?

A. It rather depends on how the question i[s] phrased. I certainly could answer the prosecutor's statement as you noted. If the question were phrased more broadly, then perhaps I would have difficulty in answering the question that you are mentioning now.

. . . .

Q. [by the Court] Well, as far as the act in question is concerned, based on the medical definition of insanity as opposed to the legal definition of insanity, you would still say that he was not insane on that narrow issue of falsifying a form?

A. Given the narrow definition, I would have to say that he was sane in regards to the filling out of the form. I would have to point out, however, that given a broader medical definition of insanity, I believe that the subject is insane.

. . . .

Q. [by defense counsel] And that's why in your report you never really came to a conclusion on whether Mr. Hansen could conform his conduct to the requirements of law, is that correct?

A. That is correct. The only way I could resolve that question was by waiting to hear the precise form the question would take.

The testimony of Dr. Ives and that of the other medical experts at the very least leaves unresolved the issue whether Hansen had substantial capacity to conform to the

requirements of the law his conduct after the precise acts that constitute the federal offenses. Unquestionably no finding has been made as to whether Hansen's mental state permits holding him responsible for his conduct subsequent to purchasing the firearm.

 The record is thus unclear both as to whether (1) Hansen could be found criminally responsible for his conduct in making the firearm available to his friend, knowing its intended use, and (2) the purposes for which such conduct was considered in enhancing the sentence. Under these circumstances we consider this to be a case where a reasoned explanation for the sentence imposed would be not only helpful, *see, United States v. Driscoll,* 496 F.2d 252 (2d Cir. 1974); *United States v. Velazquez,* 482 F.2d 139 (2d Cir.1973); *United States v. Brown,* 479 F.2d 1170 (2d Cir.1973), but necessary to ensure that the sentence has not been impermissibly enhanced, *cf. North Carolina v. Pearce, supra.* Therefore, in light of the unusual facts underlying this particular conviction, we grant the petition for rehearing, vacate the sentence, and remand to the District Court for resentencing. Upon remand, the District Court may either impose sentence without regard to Hansen's conduct subsequent to purchase of the firearm, or, if such conduct is relied upon, clarify the purpose for which such conduct is being considered. In the latter event, the sentence may not reflect any attribution of blame upon Hansen for what he did with the firearm unless the Court is able to find, on the existing or a supplemented record, that Hansen's mental state rendered him responsible for such conduct according to the *Freeman* standard. Since such a finding, if made, will be the basis for selecting a sentence rather than adjudicating guilt, it need be not established beyond a reasonable doubt. *See United States v. Fatico,* 603 F.2d 1053, 1057 & n. 9 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62

L.Ed.2d 755 (1980); *Hollis v. Smith,* 571 F.2d 685, 694–96 (2d Cir.1978). Whether or not Judge Coffrin elects to consider Hansen's use of the firearm in connection with the suicide pact, he may wish to consider, upon resentencing, the circumstances of Hansen's recent incarceration.[9]

Petition for rehearing granted, sentence vacated, and cause remanded for resentencing.

---

9. Defense counsel represents that Hansen was initially sent to the United States Medical Center for Federal Prisoners at Springfield, Missouri. He remained there only two months and was transferred to the Federal Correctional Institution at Milan, Michigan. At FCI, Milan, Hansen attempted suicide by cutting his wrists and was returned to Springfield. Counsel alleges that the Bureau of Prisons contemplates returning Hansen to Milan.